# ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402-2015
TEL: 612-349-8500  FAX: 612-339-4181
www.rkmc.com

ATTORNEYS AT LAW

Joel A. Mintzer
Admitted in Minnesota, Iowa and Illinois
JAMintzer@rkmc.com
612-349-8244

January 31, 2014                                                    *By ECF*

Hon. Steven E. Rau
United States District Court
334 Warren E. Burger Federal Courthouse
316 N. Robert Street
St. Paul, MN 55101

     Re: Harris, et al. v. Chipotle Mexican Grill, Inc.
        Case No.: 13-cv-1719

Dear Judge Rau:

Thank you for this opportunity to discuss further the conflict-of-interest issue that Mr. Simmons raised at last week's hearing. As described below, there are different types of conflicts, and the conflicts have different legal consequences.

## A.      The Conflicts

This lawsuit raises two essential types of conflicts that are clearly documented in the record. First, there is an inherent conflict between hourly-paid managers and hourly-paid crew members; and second, a conflict exists because the same claims are asserted by the same lawyers in multiple lawsuits.

### 1.      The Internal Class Conflict Between Managers and Crew.

During the hearing, Plaintiffs' counsel described the night-shift as the "sweet spot" of their claims. During the night-shift, most Chipotle restaurants close their doors to new customers at approximately 10:00 p.m., and the computer system automatically resets at 12:30 a.m. There is no dispute between the parties that the computer reset results in clocking off any employee who did not previously clock off. Thus, if an employee completed his or her work at 11:00 in the morning, but forgot to clock out, that employee (who actually left work 13.5 hours earlier) would be automatically clocked out at 12:30 a.m. the next morning. Likewise, if an employee was still working at 12:30 a.m., that employee would also be automatically clocked out.

There is also no dispute that, in the second example, Chipotle's written policy requires the employee's time records to be adjusted to reflect actual time worked. This adjustment can happen in multiple ways, each involving managers.

- First, employees can clock themselves in. For example, Jason Beebe testified during cross-examination that—as an hourly-paid Service Manager—he sets his

phone alarm to remind himself and all other employees to clock back in "right away." (Ex. 1, Beebe Dep. at 43–44.)

- Second, employees can ask the hourly-paid manager on duty to clock all employees back in and adjust records to eliminate gaps. (Ex. 2, Becerra Dep. at 28–29.) The employees know to ask. Because the system automatically clocks employees out at 12:30 a.m., the employees cannot clock-out again at, say 12:50 a.m., if they are still working. Rather, they have to clock-in again in order to clock-out, alerting the employees that they need an adjustment. (*Id.* at 125.) And when the employees do clock out, they obtain a written receipt that specifies the exact times of day during which they worked, totals the number of compensable hours, and informs them that they should "keep this for your records" because the receipt is the "verification for hours worked." (*Id.* at 121, and attached Dep. ex. 4.)

- Third, without being asked, hourly-paid managers are authorized and expected to adjust the time records; with the employee's consent. (*Id.* at 95–96.)

- And fourth, at a later time, a manager can adjust the time with the Edit Record Form that is part of the Aloha system; again with the employee's consent. (Beebe Decl. ¶ 16; Ceron Decl. ¶ 15; Hawkins Decl. ¶ 15; Becerra (Hernandez) Decl. ¶ 16.) Even Harris concedes that such edits occurred occasionally. (Harris Decl. ¶ 7.)

Because hourly-paid managers are responsible to adjust employee time records to reflect actual time worked, either upon request or *sua sponte*, this lawsuit creates a conflict of interest. The crew members will need to blame the hourly-paid managers (who are also in the putative class), and the hourly-paid managers will deny the allegations in order to avoid personal legal liability, *see Lucas v. Jerusalem Café*, 721 F.3d 927, 930 (8th Cir. 2013) (affirming FLSA overtime verdict against employer and manager), or to avoid work-place discipline.

This conflict is not theoretical. Of the four named plaintiffs, Julius Caldwell and Dana Evenson were hourly-paid managers, and they admit that they had required "hourly-paid employees to punch out early and work off the clock." (Caldwell Decl. ¶ 10; Evenson Decl. ¶ 10.) In contrast, putative opt-in Leah Turner states that, when she was a manager, she "attempted to ensure that all employees were properly paid for the hours they worked." (Turner Decl. ¶ 15.)[1]

Plaintiffs may attempt to circumvent this conflict by arguing that Chipotle uniformly (as a nationwide "policy") forces every hourly-paid manager to make other employees work off the clock. But Plaintiffs have no colorable evidence. In fact, an initial review of

---

[1] Plaintiff Harris revealed another layer of conflict that arises when crew members are pitted against managers. He accuses hourly managers Barbon and Hernandez of retaliation and an assault, claiming Mr. Barbon "shouted at me, knocked a pan out of my hand" after he filed the lawsuit. (Harris Supp. Decl. ¶ 16.)

Chipotle's data shows between about 66,000 and 100,000 instances in which employees were paid for time after the automatic clock-out as a result of the various systems Chipotle uses to enforce its lawful policies. (Ex. 3.)

## 2.      Representational Conflict.

The second type of conflict is similar to that described in *Lou v. Ma Labs., Inc.*, No. 12-5409 (N.D. Cal. Jan. 8, 2014). In *Lou*, an off-the-clock case, the court faced a situation in which proposed class counsel had filed two lawsuits seeking to represent the same class as against the same defendant on substantially similar theories. *Id.* at 1–2. The court noted that this created a conflict of interest that "doomed" plaintiffs' conditional certification motion as each plaintiffs in each case deserve to be represented by counsel who are unencumbered by their duties in a different case. *Id.* at 3. This conflict can manifest itself in multiple ways, but it becomes most apparent when the parties begin discussing settlement. Because defendants typically desire global peace, and therefore want to settle all claims if it settles at all, the pursuit of multiple lawsuits creates opportunities for plaintiffs' counsel "to manipulate the allocation of settlement dollars" between the differing lawsuits. *Id.* Thus, "Courts have consistently held that counsel cannot simultaneously represent and prosecute either individual or class claims against the same defendants in a different proceeding, even if there is partial overlap among the plaintiffs or class members in the cases." *Id.* (quoting 1 McLaughlin on Class Actions 4:39 (10th ed.))

This same conflict exists here. The same lawyers who represent Leah Turner as an opt-in to this case also represent her in two other lawsuits (and Ms. Turner is also participating in yet another action against Chipotle).

In March 2013, Leah Turner filed an FLSA lawsuit against Chipotle in the District of Colorado on behalf of herself and "others similarly situated." Ms. Turner alleged that, as an hourly-paid manager, she "was required to clock-out after she worked forty hours for Defendant in a work week [and she was] required by Defendant to continue to work off-the-clock." *Complaint* at ¶ 35 (Ex. 4.). In that action, Ms. Turner was represented by Bachus & Schanker, LLC.

Bachus & Schanker, now joined by the Williams Law Firm and the Law Offices of Adam Levy, filed a second lawsuit against Chipotle in Colorado in June 2013 (the "Hobbs" case) as a proposed collective action. Even though some of the same attorneys filed the Turner case with similar claims in March, no designation of related case was filed. The Harris case was filed in Minnesota in July, and the Hobbs and Harris cases were later consolidated.

Despite the pendency of her own action, on October 18, 2013, Ms. Turner signed a consent to opt into this lawsuit, and she proposed the appointment of Bachus & Schanker, as well as the Williams Law Firm and the Law Office of Adam S. Levy as counsel. (ECF No. 32 at 7, filed Oct. 23, 2013.) Four weeks after that, on November 14, Bachus & Schanker asked that Ms. Turner's Colorado case be stayed (not dismissed) in light of that

consent. Turner did not want to dismiss her Colorado lawsuit because of the possibility that the Minnesota court might not certify a class. (Ex. 5.) Ultimately, the parties agreed to a dismissal without prejudice, with Turner retaining her right to reinstitute her Colorado suit. The Turner case was not dismissed until December 27, 2013. (Ex. 6.)

In addition to her own FLSA off-the-clock case, Ms. Turner has joined yet another FLSA case. In February 2013, even before filing her off-the-clock lawsuit, Ms. Turner joined the *Scott* case, which asserts that Chipotle misclassified assistant general managers, known as Apprentices, as exempt salaried employees. (Ex. 7.)

Ms. Turner's and her counsel's fourth action against Chipotle is a claim brought under Colorado's workers' compensation system. Ms. Turner was injured on-the-job on May 19, 2012, and the parties dispute the necessity of various medical services. Ms. Turner is represented by Bachus & Schanker in that matter as well. While the factual basis for this claim is largely distinct from her three FLSA lawsuits, it proves the very conflict that concerned the *Lou* court.

In the workers' comp case, Ms. Turner sent a settlement demand to Chipotle on November 4, 2013 (which was after she had opted into the Minnesota action but before seeking dismissal of her Colorado action). (Ex. 8.) On November 18, Chipotle's counsel asked if Ms. Turner was "interested in settling all of her claims including the employment issue." (Ex. 9.) Ms. Turner's lawyer responded: "She will do a global settlement, including the employment claim. This is not a sticking point issue." (*Id.*) As the date for mediation approached, Chipotle's counsel, desiring the type of "global peace" identified in *Lou*, sought reassurance on January 14, 2014: "I assume that this is the current demand on a global basis to resolve any and all claims. I need you to confirm the same immediately before we get closer to the settlement conference." (Ex. 10.) Turner's response: "Yes, that was for a global settlement." (*Id.*) On January 21, Chipotle unilaterally cancelled the mediation. (Ex. 11.)

### B.       The Legal Consequences

These serious conflicts highlight two significant legal obstacles to class certification: manageability and adequacy of counsel.

In *Saleen*, Magistrate Judge Keyes noted that, even at the initial stage of an FLSA case, "it is incumbent on a court" to consider manageability. *Saleen v. Waste Mgmt., Inc.*, No. 08-4959, 2009 U.S. Dist. LEXIS 49891, at *26 (D. Minn. June 15, 2009). In this case, even the "sweet spot" of Plaintiffs' claim requires proof that hourly-paid managers disregarded Chipotle's written policy in order to enforce an unwritten, but nationwide, policy not to adjust time entries after the system reset. This proof will vary from employee to employee, from manager to manager, and from store to store. The conflict-of-interest between the thousands of hourly-paid managers and the hourly-paid crew members is sufficiently serious that conditional FLSA certification should be denied. *White v. Osmose, Inc.*, 204 F. Supp. 2d 1309, 1314-15 (M.D. Ala. 2002). Indeed, even numerous salaried

managers (such as Ms. Turner) worked in hourly manager and non-manager positions within the three-year period in issue. The manageability issues precluding certification in *Saleen*, which did not involve any conflicts, are dwarfed by those present here.

Though not separately articulated in the FLSA, plaintiffs' counsel must be "adequate" in order to represent a class. *Lou*, at 3. The adequacy inquiry seeks, in part, to uncover conflicts of interest. *Amchem Prods. v. Windsor*, 521 U.S. 591, 625 (1997). In this case, the conflict between hourly-paid managers and hourly-paid crew members also places proposed class counsel in an irreconcilable conflict. As counsel for the entire proposed class, they may be forced to choose whether to attack the testimony of the plaintiff-managers who deny knowing that crew members worked off-the-clock, or instead defend the plaintiff-managers from claims by crew members that could result in the managers' liability or job discipline. *See Ellerd v. County of Los Angeles*, No. CV-08-4289, 2009 U.S. Dist. LEXIS 36865, at *12–14 (C.D. Cal. Apr. 9, 2009) (denying conditional certification where counsel could not represent both workers and their supervisors on their off-the-clock claims). The issue here is further highlighted by the responsibility of hourly managers such as Caldwell and Evenson to ensure that all time was accurately recorded, including time worked on closing shifts.

Finally, there is the adequacy issue raised in *Lou*. In this case, as in *Lou*, proposed class counsel have sought to resolve the same claims in multiple proceedings. Plaintiffs' counsel have filed three lawsuits against Chipotle on the same FLSA off-the-clock claims: in March 2013, they filed Ms. Turner's lawsuit; in June 2013, they filed the Hobbs lawsuit; and in July 2013, they filed the Harris lawsuit. Based on Chipotle's objections, the Hobbs lawsuit was transferred to this Court and consolidated with Harris. The Turner lawsuit was dismissed months after the instant motion was filed, but in a manner permitting Ms. Turner to re-file her lawsuit. And then, even in her remaining workers' compensation case, Plaintiffs' counsel would settle her employment claims.

These multiple layers of conflicts are not of Chipotle's making. Plaintiffs and their counsel created these issues by simultaneously filing four separate individual and class actions. These facts show yet another reason why adjudication of these claims on a class-wide basis is neither manageable, suitable, nor desirable.

Sincerely,

Joel A. Mintzer