# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Marcus Harris, Julius Caldwell, Demarkus Hobbs, and Dana Evenson, on behalf of themselves and all others, similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>Chipotle Mexican Grill, Inc.,<br><br>Defendant. | Civil No. 13-cv-1719 (SRN/SER)<br><br><br><br>**MEMORANDUM OPINION AND ORDER** |

---

Adam S. Levy, Law Office of Adam S. Levy LLC, P.O. Box 88, Oreland, Pennsylvania 19075; Andrew C. Quisenberry and Jere Kyle Bachus, Bachus & Schanker, LLC, 1899 Wynkoop Street, Suite 700, Denver, Colorado 80202; Kent M. Williams, Williams Law Firm, 1632 Homestead Trail, Long Lake, Minnesota 55356; Kevin E. Giebel, Giebel and Associates, LLC, P.O. Box 414, Lake Elmo, Minnesota 55042; and Michael E. Jacobs and Thomas M. Hnasko, Hinkle Shanor LLP, 218 Montezuma Avenue, Santa Fe, New Mexico 87501, for Plaintiffs.

Adam M. Royval, Allison J. Dodd, John K. Shunk, Louis M. Grossman, Scott L. Evans, and Spencer Kontnik, Messner Reeves LLP, 1430 Wynkoop Street, Suite 300, Denver, Colorado 80202; Jeffrey Sullivan Gleason, Robins Kaplan LLP, 800 LaSalle Avenue, Suite 2800, Minneapolis, Minnesota 55402; and Jennifer M. Robbins, Madel PA, 800 Hennepin Avenue, Suite 700, Minneapolis, Minnesota 55403, for Defendants.

---

SUSAN RICHARD NELSON, United States District Court Judge

This matter is before the Court on the Motion to Decertify the Conditionally

Certified Collective [Doc. No. 244] filed by Defendant Chipotle Mexican Grill, Inc.

("Chipotle"). For the reasons stated below, Defendant's motion is denied.

# I.    BACKGROUND

## A.    Procedural Background

The procedural background of this case is well documented in the Court's September 9, 2014 Memorandum Opinion and Order (the "Conditional Certification Order") [Doc. No. 101] and is incorporated herein by reference.  Briefly stated, Plaintiffs Marcus Harris, Julius Caldwell, DeMarkus Hobbs, and Dana Evenson (collectively, "Named Plaintiffs") filed claims, on behalf of themselves and all others similarly situated, against Defendant Chipotle Mexican Grill, Inc. ("Defendant") pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201–219, and the Minnesota Fair Labor Standards Act, Minn. Stat. §§ 177.21–177.35.[1]  (Consolidated Am. Class Action Compl. [Doc. No. 31] ("Am. Compl.") ¶ 1.)  The Named Plaintiffs, who were all hourly employees at the Chipotle restaurant in Crystal, Minnesota ("the Crystal Restaurant"), generally allege that Defendant has a company-wide unwritten policy of requiring hourly-paid employees to work "off the clock" and without pay, and they seek to recover allegedly unpaid overtime compensation and other wages.  (See id. ¶¶ 3–4.)

On September 9, 2014, the Court conditionally certified the following collective under the FLSA:

> All current and former hourly-paid restaurant employees of Chipotle
> Mexican Grill, Inc. who were employed at Chipotle's Crystal, Minnesota

---

[1] Plaintiffs Hobbs and Evenson originally brought a separate lawsuit against Defendant, Hobbs v. Chipotle Mexican Grill, Inc., No. 13-cv-2738 (SRN/SER), that was ordered to be consolidated with the present action on October 16, 2013 [Doc. No. 25].

restaurant and, on or after April 10, 2011, were automatically punched off the clock by the Aloha timekeeping system at 12:30 a.m. and continued to work, or who otherwise worked "off the clock" during closing shifts, resulting in non-payment of regular wages or overtime wages.

(Order of 9/9/14 at 31.)  During the "opt-in" period, the following members joined the collective action and remain members:  Larae Austin, Jazmika Briggs, Ryan Cox, Andrea Daher, George Dilliard, Jr., Martha Dubon Rivas, Emma Finkenaur, Richard Hamilton, Brian James, Edward Jones, Natesa Leanna, Katrina Londo, Jose Morales Soto, Anthony Ortega, Tiffany Slipka, Shane Saunders, Wayne Sorrell, Rye'nise Sumrall, Brian Thompson, Cedrick Washington, Shane Williams, John Xiong, and Jennifer (Young) Hofschulte.  (See Consent to Join Forms [Doc. Nos. 77, 82, 129, 135, 139, 140].)  These 23 members may be referred to collectively herein as the "Opt-in Plaintiffs" or, together with the four Named Plaintiffs, "Plaintiffs."[2]

## B.    Chipotle's Organization

Defendant operates more than 2,100 Mexican food restaurants, in 46 states and the District of Columbia, as well as internationally.  (Decl. of David Gottlieb in Supp. Def.'s Mot. to Decertify [Doc. No. 249] ¶ 4.)  Defendant's domestic restaurants are divided into nine geographic regions., and regional directors and executive team directors are responsible for the operations of the restaurants within their region.  (Id. ¶¶ 5-6.)  Within a given region, the organizational structure, in order of descending authority, consists of a

---

[2] Three additional persons joined as opt-in plaintiffs, but were subsequently dismissed with prejudice for failing to participate in discovery.  (See Order of 11/1/16 [Doc. No. 236].)

team director (who oversees a "market" of several areas, or "patches"), team leader (who oversees a group of stores for a certain patch), and restauranteur (a general manager who attains certain goals and may be given oversight of up to four additional stores). (See id. ¶ 7.) Since September 2011, the team director for Minnesota, which includes the Crystal Restaurant, has been Travis Moe. (Decl. of Kent M. Williams in Supp. Pls.' Opp'n Mem. [Doc. No. 394], Ex. M (Moe Dep. at 10-11); Ex. P (Ramirez Dep. at 32-34).) Until approximately July 2015, the team leader for the Crystal Store was Todd Patet, (Williams Decl., Ex. O (Patet Dep. at 23, 296-97); Ex. P (Ramirez Dep. at 38-39)), and Alex Cortez was the restauranteur with oversight over the Crystal Restaurant until November 2012, when Jose Ramirez was given that position. (Williams Decl., Ex. P (Ramirez Dep. at 11, 13).)

The staffing in each Chipotle restaurant may include, in order of descending authority, a general manager, one or more "apprentices" (assistant managers, or "apprentice managers"), one or more service managers, one or more kitchen managers, and 15 to 50 crew members. (Gottlieb Decl. ¶ 9.) Service managers, kitchen managers, and crew members are paid on an hourly basis, whereas general managers and apprentice managers are salaried employees. (Id.)

Currently, the Crystal Restaurant is staffed by a salaried general manager, two hourly service managers, one hourly kitchen manager, and approximately 21 full and part-time hourly crew members. (Id.) At least three persons served as the salaried general manager at the Crystal Restaurant during the relevant period: (1) Dustin Schultz, from the

April 2011 start of the collective action period through approximately December 2011; (2) Jeff Mobley, from approximately December 2011 to February 2012; and (3) Jose Ramirez, from approximately February 2012 until March 2016. (Williams Decl., Ex. L (James Dep. at 23); Ex. J (Hobbs Dep. at 24); Ex. R (Thompson Dep. at 26); Ex. E (Dubon Rivas Dep. at 50); Ex. P (Ramirez Dep. at 9, 17, 107); Ex. F (Evenson Dep. at 31); Ex. G (Finkenaur Dep. at 29); Ex. C (Briggs Dep. at 31); Ex. T (Xiong Dep. at 25).) Most of the Named Plaintiffs and Opt-In Plaintiffs identified Ramirez as the general manager during their tenure. (See, e.g., Williams Decl., Ex. L (James Dep. at 23); Ex. J (Hobbs Dep. at 24); Ex. R (Thompson Dep. at 26); Ex. E (Dubon Dep. 50).) At least three persons served as apprentice managers at the Crystal Restaurant during the relevant period: (1) Julissa Douville, from the April 2011 start of the collective action period through approximately December 2011; (2) Armando Aguayo, from approximately December 2011 to April 2012; and (3) Flinte Smith, from April 2012 to October 2013. (Williams Decl., Ex. P (Ramirez Dep. at 92-93); Ex. M (Moe Dep. at 19); Ex. K (Hofschulte Dep. at 24); Ex. T (Xiong Dep. at 25); Ex. U (Smith Decl. ¶ 2); Ex. W (9/2011 Email Chain).) Most of the Plaintiffs identified Smith as their "manager." (See Williams Decl., Ex. N (Ortega Dep. at 19); Ex. L (James Dep. at 24-25); Ex. S (Washington Dep. at 22); Ex. G (Finkenaur Dep. at 31); Ex. C (Briggs Dep. at 31); Ex. R (Thompson Dep. at 25); Ex. E (Dubon Rivas Dep. at 36).)

The Plaintiffs are hourly employees who were employed at the Crystal Restaurant. Named Plaintiff Harris was a crew member from his hiring in January 2013 through his

termination in April 2014, (Decl. of Jeffrey S. Gleason Decl. [Doc. No. 247], Ex. A

(Harris Dep. at 14-15, 17, 32, 43)); Caldwell was hired as a crew member in April 2012

and was later promoted to kitchen manager, and later, service manager, before resigning in

July 2013, (Ex. B (Caldwell Dep. at 15-16, 27, 150)); Evenson, hired in February 2012 as

a crew member, later worked as a kitchen manager and service manager before resigning

in June 2013, (Ex. D (Evenson Dep. at 24, 43, 46, 94)); Hobbs worked as a crew member

from May 2012 until his resignation in May 2013. (Gleason Decl., Ex. E (Hobbs Dep. at

18, 24, 42).) The 23 Opt-In Plaintiffs, who worked at the Crystal Restaurant between

2010 and 2016, worked as crew members, hourly kitchen managers, and hourly service

managers. (See Consent to Join Forms [Doc. Nos. 77, 82, 129, 135, 139, 140].)

C.    **Chipotle's Policies**

Defendant has a formal "timekeeping/time punch policy," which states that "[a]ll

hourly employees are paid for all time worked. This is the law and Chipotle's policy."

(Gottlieb Decl., Ex. 1 (June 2016 Crew Handbook at 25); Ex. 4 (June 2016 Restaurant

Mgmt. Handbook at 18).)[3] It also states that "[h]ourly employees are not permitted to

work unless clocked in. Working off the clock is not permitted, ever." (Gottlieb Decl., Ex.

---

[3] This language is quoted from more recent versions of Chipotle's Crew Handbook and Restaurant Management Handbook, both dated June 2016. This language has been in effect since April 2012, without material change. (Gottlieb Decl. ¶ 13.) Previous versions contained similar language—i.e., employees "must be paid for all time worked." (Gottlieb Decl., Ex. 2 (Jan. 2011 Crew Handbook at 20); Ex. 3 (April 2012 Crew Handbook at 22).)

1 (June 2016 Crew Handbook at 25).)[4] In addition, the policy provides a procedure for editing the time recorded in the timekeeping system. (Gottlieb Decl., Ex. 1 (June 2016 Crew Handbook at 26); Ex. 4 (June 2016 Restaurant Mgmt. Handbook at 19-21).)[5] Chipotle requires all employees at the Crystal Restaurant to review the applicable handbook and sign a form attesting to their understanding and compliance with its policies. (Gottlieb Decl. ¶¶ 12; 16.)

Defendant's timekeeping system, called "Aloha," records its hourly employees' time. (Id. ¶ 24.) The Aloha system automatically "re-sets" for the next day at 12:30 a.m., which has the effect of clocking out any employee who was clocked in when the re-set occurred. (Id. ¶ 31-32.)

### D.     Crystal Restaurant

The former general manager and restauranteur of the Crystal Restaurant, Ramirez, testified that during the relevant period, there were two shifts at that location–a day shift and an evening, or closing, shift. (Williams Decl., Ex. P (Ramirez Dep. at 117).) The duties of the closing shift staff included cleaning, counting money, prepping food, and locking up. (Williams Decl., Ex. D (Caldwell Dep. at 89-91); Ex. N (Ortega Dep. at 45,

---

[4] In addition, the policy provides a procedure for editing the time recorded in the timekeeping system. (Gottlieb Decl., Ex. 1 (June 2016 Crew Handbook at 26); Ex. 4 (June 2016 Restaurant Mgmt. Handbook at 19-21).)

[5] Previous versions of the Crew Handbook also contained procedures for editing time punches. (Gottlieb Decl., Ex. 2 (Jan. 2011 Crew Handbook at 20); Ex. 3 (April 2012 Crew Handbook at 23).)

48); Ex. L (James Dep. at 58-59, 65); Ex. S (Washington Dep. at 39-40, 45); Ex. F (Evenson Dep. at 66); Ex. G (Finkenaur Dep. 49-50); Ex. C (Briggs Dep. at 67-69); Ex. K (Hofschulte Dep. at 47); Ex. T (Xiong Dep. at 26, 31).)  When Ramirez worked at the Crystal Restaurant, he was generally the manager during the day shift and Smith was the manager during the evening shift.  (Williams Decl., Ex. P (Ramirez Dep. at 118).) Ramirez typically scheduled one hourly manager and four hourly crew members to work the closing shift.  (Id., Ex. P (Ramirez Dep. at 167).)

The Crystal Restaurant is open to the public until 10:00 p.m.  (Williams Decl., Ex. F (Evenson Dep. at 66); Ex. O (Patet Dep. at 71).)  Ramirez generally scheduled the closing shift to conclude at 11:30 p.m.  (Williams Decl., Ex. P (Ramirez Dep. at 220-21).) The team director at that time, Travis Moe, testified that the goal was for staff to leave the restaurant between 11:00 p.m. and 11:30 p.m. (Williams Decl., Ex. M (Moe Dep. at 137-38).)  However, Ramirez testified that employees working the night shift were required to stay until the store was fully cleaned.  (Williams Decl., Ex. P (Ramirez Dep. at 120-21).) The general expectation, Ramirez testified, was that "everybody leaves together."  (Id.) Consistent with Ramirez's testimony, Plaintiffs who served as crew members testified that they stayed until all work was completed, (Williams Decl., Ex. L (James Dep. at 61); Ex. S (Washington Dep. at 37, 50-51, 63); Ex. G (Finkenaur Dep. at 77-78); Ex. R (Thompson Dep. at 57); Ex. E (Dubon Rivas Dep. at 33-34), and service and kitchen managers also stayed late to help crew members finish their duties.  (Williams Decl., Ex. T (Xiong Dep. at 30-31).)  During closing shifts, Plaintiffs testified to working past 12:30 a.m., and as

late as 3:00 a.m. (Williams Decl., Ex. L (James Dep. at 64) (worked past 12:30 a.m. "frequently"); Ex. S (Washington Dep. at 47, 54) (estimated an average departure time of "about 1 o'clock"); Ex. I (Hawkins Dep. at 41) (stayed until 1:00 or 1:30 a.m. on Fridays or Saturdays); Ex. F (Evenson Dep. at 67) (worked until 12:30 or 1:00 a.m.); Ex. J (Hobbs Dep. at 58) (stayed after 1:00 a.m. "more than a couple times"); Ex. G (Finkenaur Dep. at 37) (recalled working until about 2:00 or 3:00 a.m.).)

While Chipotle's written policies prohibited off-the-clock work, Plaintiffs testified that, in actuality, they were required to clock out and continue working, off the clock, until their work was completed. (Williams Decl., Ex. F (Evenson Dep. at 36, 68-69, 87-88) (Chipotle had "an official unwritten policy we were not allowed to clock back in after 12:30, or even when we were told to clock out at 11:15;" Smith and Aguayo made people work off the clock); Ex. J (Hobbs Dep. at 29, 34-35, 44) (it was "common sense" to not work off the clock, but that was not the policy at the Crystal store; Smith told him to clock out and keep working); Ex. K (Hofschulte Dep. at 53, 59, 64) (acknowledging that the practice of requiring off-the-clock work violated Chipotle's written policy, but Smith nonetheless told her to clock out and keep working); Ex. L (James Dep. at 68) (Aguayo, Smith, and Ramirez told him to work off the clock); Ex. G (Finkenaur Dep., 76-77) ("that was their written policy, but not what we were told"); Ex. R (Thompson Dep. at 37, 104-05) (policy at the Crystal Restaurant did not conform with the written policy and working off the clock "was mandatory with a manager"); Ex. B (Austin Dep. at 57-58) (employees were expected to finish cleaning by 11:15 p.m. or 11:30 p.m. and were required to clock

out around 11:15 p.m. regardless of whether they were finished working); Ex. T (Xiong

Dep. at 19, 37-40) (the "actual policy" was to require people to work off the clock and he

was told to do so); Ex. C (Briggs Dep. at 73) (people were required to clock out at 11:30

p.m. and finish working); see also Ex. XX (Daher Interrog. Resp. No. 3) ("Chipotle

required its hourly employees to work off the clock as needed to meet labor budgets.

Plaintiff and others were specifically instructed to clock out before midnight or else the

computer system would clock them out. Everyone was required to stay, even though they

were clocked out."); Ex. YY (Dilliard Interrog. Resp. No. 3) ("Chipotle required its hourly

employees to work off the clock as a customary practice and Chipotle's system

automatically clocked out employees before they were done working."); Ex. ZZ (Sumrall

Interrog. Resp. Nos. 3, 14 and 15) ("My managers directed me and other crew members to

work off the clock and/or were aware that I and other crew members were made to work

off the clock without being paid."); Ex. AAA (Williams Interrog. Resp. No. 3) ("Chipotle

required its hourly employees to work off the clock. There was an automatic time where

everyone had to be clocked out and it seemed to be to conform to labor budgets."); Ex.

BBB (Jones Interrog. Resp. No. 3) (same); Ex. CCC (Hamilton Interrog. Resp. No. 3)

(same); Ex. DDD (Sorrell Interrog. Resp. No. 3) (same); Ex. ZZ (Sumrall Response to

Interrogatory No. 3) (same); Ex. EEE (Cox Interrog. Resp. No. 3) (same); Ex. AAA

(Williams Interrog. Resp. No. 3) (same); Ex. XX (Daher Interrog. Resp. No. 3) (same).)

In a declaration filed in a related lawsuit against Chipotle in the District of

Colorado, Smith stated that his superiors, including Moe and Patet, were aware that the

general managers and apprentice managers in Moe's 50-store area required their hourly employees to work off the clock in order to meet Chipotle's requirement "to do anything to keep labor costs down." (Williams Decl., Ex. U (Smith Decl. ¶ 8).) Further, Smith stated that he was directed to clock out hourly night shift crew members before 12:30 a.m. and require them to keep working after they were clocked out. (Id. ¶ 11.)

If an employee working the night shift did not clock out, the Aloha re-set would automatically clock out the employee at 12:30 a.m. (Williams Decl., Ex. N (Ortega Dep. at 57-58) (the automatic system would clock out employees if they did not do so); Ex. L (James Dep. at 64) (auto-clockouts happened "frequently"); Ex. S (Washington Dep. at 49-51, 56) (describing clocking out at the direction of management as well as being automatically clocked out without his knowledge); Ex. F (Evenson Dep. at 47-48) (stating that she kept working after she was automatically clocked out); Ex. J (Hobbs Dep. at 47) (describing the 12:30 a.m. automatic clockout); Ex. K (Hofschulte Dep. at 60) (stating that after 12:30 a.m., the computer would automatically clock out the employees); Ex. T (Xiong Dep. at 12) ("during evening shifts we were automatically clocked out at 12:30 and continued to be–to work until our task is finished"); Ex. G (Finkenaur Dep. at 62) (stating that her general manager, Jeff Mobley, told her to clock out during closing shifts or the Aloha system would do it automatically).) Smith, the former apprentice managers, stated "[d]ue to Chipotle's desire to keep down labor costs, shifts were often understaffed. Night shifts were usually so understaffed that we could not get all of our work done before the 12:30 a.m. 'reset.'" (Williams Decl., Ex. U (Smith Decl. ¶ 11).) Plaintiffs testified that

once they were clocked out, they were not permitted to clock back in.  (Williams Decl., Ex. C (Briggs Dep. at 57-59) (stating that Smith and Aguayo told them they could not clock back in); Ex. L (James Dep. at 34, 69) (testifying that he was never told to clock back in after the 12:30 a.m. automatic clockout); Ex. S (Washington Dep. at 27) (indicating that he was not trained to clock back in after the automatic clockout); Ex. K (Hofschulte Dep. at 63) (testifying that she could not recall "any occasion when you were clocked out at 12:30 a.m. and then you clocked back in right away"); Ex. E (Dubon Rivas Dep. at 28) (stating that "I don't believe we could" clock in after the 12:30 a.m. automatic clockout).)

After completion of the closing work, Plaintiffs testified that closing shift workers were expected to stay for an additional 10-30 minute off-the-clock meeting called "Chip Talk."  (Williams Decl., Ex. P (Ramirez Dep. at 116-17); Ex. N (Ortega Dep. at 51-53); Ex. S (Washington Dep. at 47-48, 62); Ex. F (Evenson Dep. at 71-72); Ex. J (Hobbs Dep. at 47-48); Ex. C (Briggs Dep. at 45, 57); Ex. E (Dubon Rivas Dep. at 37-38; Ex. L (James Dep. at 41).)  These meetings focused on issues of general team performance and improvement.  (Williams Decl., Ex. P (Ramirez Dep. at 116-117, 120); Ex. F (Evenson Dep. at 72).)

Several Plaintiffs complained directly to salaried managers Ramirez, Smith, Aguayo and/or Mobley about off-the-clock work. (Williams Decl., Ex. K (Hofschulte Dep. at 61-62, 66) (testifying that she complained to Ramirez, Smith, and Aguayo); Ex. ZZ (Sumrall Interrog. Resp. No. 7) ("I voiced concerns and complained to my managers and

requested to be paid for time working off the clock, but I was not paid for the time."); Ex. Q (Saunders Dep. at 61-62, 76) (stating that he was told something like "this is how things work at the Crystal Restaurant, you need to work off the clock to get your job done"); Ex. H (Harris Dep. at 90) (stating that she complained to salaried managers Ramirez and Smith, as well as hourly service managers Evenson and Caldwell); Ex. J (Hobbs Dep. at 21) (stating that he complained to Smith and Ramirez); Ex. C (Briggs Dep. at 56, 87) (testifying that she complained to Aguayo after having to work off the clock after 11:30 p.m. when she was pregnant); Ex. L (James Dep. at 76) (stating that Ramirez responded to his complaints by saying "that he needed to see more improvement in the store," which would make "people eligible for promotions"); Ex. J (Hobbs Dep. at 21, 38-39) (testifying that Ramirez said he would look into it, but that the practice never stopped.); Ex. G (Finkenaur Dep. at 82-83) (stating that she complained to Mobley); Ex. T (Xiong Dep. 37-40) (noting that he passed complaints about off-the-clock work on to Mobley, but could not recall any response).)  Several Plaintiffs, including Named Plaintiffs and Opt-In Plaintiffs as well, testified that they were threatened or faced other negative consequences after complaining about off-the-clock work.  (See Williams Decl., Ex. BB (December 27, 2013 Harris Supp'l Decl. ¶¶ 10-12) (stating that his hours were cut after he complained about off-the-clock work); Ex. D (Caldwell Dep. at 40) (testifying that when he complained to Smith, he was informed that "if [he] couldn't get the job done at the time, that they would find somebody who could"); Ex. C (Briggs Dep. at 56, 87) (testifying that Smith would say "'[D]o you like your job or not[?]'" to anyone who complained about

13

off-the-clock work); Ex. F (Evenson Dep. 93) (testifying that she tried to stop the off-the-clock practice and restore off-the-clock hours, but Smith reprimanded her for doing so).) Evenson, who eventually worked as a service manager, further stated that she learned from coworkers that she was about to be fired for "bad labor goals," for "not letting people punch out and work off the clock."  (Williams Decl., Ex. F (Evenson Dep. at 16).)

## II.    DISCUSSION

The FLSA authorizes employees to bring a collective action against employers to recover unpaid overtime. 29 U.S.C. § 216(b). Unlike a Rule 23 class action, no employee is a party to an FLSA collective action unless "'he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.'"  Smith v. Heartland Auto. Servs., Inc., 404 F. Supp. 2d 1144, 1149 (D. Minn. 2005) (citation omitted).  "Courts have discretion, in 'appropriate cases,' to facilitate the opt-in process by conditionally certifying a class and authorizing court-supervised notice to potential opt-in plaintiffs."  Saleen v. Waste Mgmt., Inc., 649 F. Supp. 2d 937, 939 (D. Minn.2009) (quoting Hoffmann–La Roche Inc. v. Sperling, 493 U.S. 165, 169 (1989)).

"To proceed with a collective action, Plaintiffs must demonstrate that they are similarly situated to the proposed FLSA class."  Brennan, No. 07-cv-2024 (ADM/JSM), 2008 WL 819773, at *3 (D. Minn. Mar. 25, 2008).  Determining whether Plaintiffs are similarly situated to the proposed class requires a two-step inquiry.  See Burch v. Qwest Commc'ns Int'l, Inc., 500 F. Supp. 2d 1181, 1186 (D. Minn. 2007) (citations omitted). "First, the court determines whether the class should be conditionally certified for

14

notification and discovery purposes." Id. (citation and internal quotation marks omitted). "[T]he plaintiffs need only establish [at that time] a colorable basis for their claim that the putative class members were the victims of a single decision, policy, or plan." Id. (citation and internal quotation marks omitted). Determination of class status at this stage is granted liberally because the court has minimal evidence for analyzing the class. Ray v. Motel 6 Operating, Ltd. P'ship, No. 3-95-828, 1996 WL 938231, at *2 (D. Minn. Mar. 18, 1996) (citation omitted). As noted, because the Court previously determined that Plaintiffs met the first step when it issued its Conditional Certification Order and the parties then proceeded with discovery, the case is now at the second step.

At this stage, the court conducts an inquiry into several factors if there is a motion to decertify, as is the case here. Burch, 500 F. Supp. 2d at 1186. "If a class is decertified, opt-in class members are dismissed without prejudice, and the case proceeds only in the putative class representatives' individual capacities." Keef v. M.A. Mortenson Co., No. 07–CV–3915 (JMR/FLN), 2008 WL 3166302, at *2 (D. Minn. Aug. 4, 2008). At this second stage, a court will again analyze whether the plaintiffs are similarly situated to the proposed FLSA class and will consider the following factors: "'(1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; [and] (3) fairness and procedural considerations.'" Bouaphakeo v. Tyson Foods, Inc., 765 F.3d 791, 796 (8th Cir. 2014) (quoting Thiessen v. Gen. Elec. Capital Corp., 267 F.3d 1095, 1103 (10th Cir. 2001)). Courts further consider whether the plaintiffs can demonstrate that the defendant had a

common policy or plan in violation of the FLSA that impacted the plaintiffs. <u>Burch v. Qwest Commc'ns Int'l, Inc.</u>, 677 F. Supp. 2d 1101, 1111 (D. Minn. 2009).

While it is Plaintiffs' burden to establish that they are similarly situated, "[this] burden is not so rigorous that they must demonstrate their positions are identical to those of the opt-in plaintiffs." <u>Nerland v. Caribou Coffee Co., Inc.</u>, 564 F. Supp.2d 1010, 1019 (D. Minn. 2007) (citations omitted). Instead, they must demonstrate similar positions. <u>Id.</u> While plaintiffs must establish that they are similarly situated, the actual merits of their claims are not considered at the decertification stage. <u>Id.</u> It is within the district court's discretion to certify or decertify a collective action under section 216(b). <u>Id.</u> (citations omitted).

Defendant moves to decertify the collective, arguing that Plaintiffs are not similarly situated with respect to the alleged off-the-clock violation and that conflicts of interest among the Plaintiffs compel decertification.

## A. Similarly Situated

### 1. Common Plan or Policy

One way in which plaintiffs in a FLSA collective action may demonstrate that they are similarly situated is by showing that they "'suffer from a single, FLSA-violating policy, and when proof of that policy or of conduct in conformity with that policy proves a violation as to all the plaintiffs.'" <u>Bouaphakeo</u>, 765 F.3d at 796 (quoting <u>O'Brien v. Ed Donnelly Enters., Inc.</u>, 575 F.3d 567, 585 (6th Cir. 2009)). Chipotle acknowledges that its timekeeping and time-punch policies are common and applicable to all Crystal Restaurant

employees. (Def.'s Mem. Supp. Mot. to Decertify at 19 [Doc. No. 246].) But it argues that these policies are entirely lawful and that Plaintiffs have failed to otherwise identify a common plan or policy in violation of the law. (Id. at 20; Def.'s Reply at 9-16 [Doc. No. 396].)

"[E]vidence of lawful written policies compensating for overtime work does not automatically defeat a FLSA claim where a plaintiff presents 'countervailing evidence' of a common policy of not paying for overtime." Allen v. City of Chicago, No. 10 C 3183, 2013 WL 146389, at * 4 (N.D. Ill. Jan. 14, 2013) (citing Brand v. Comcast Corp., No. 12 C 1122, 2012 WL 4482124, at *5 (N.D. Ill. Sept. 26, 2012)). In LaFleur v. Dollar Tree Stores, Inc., 30 F. Supp. 3d 463, 471 (E.D. Va. 2014), the court found that "[n]otwithstanding Dollar Tree's written policy prohibiting off-the-clock work, Plaintiffs indicate the corporation had an unwritten practice of allowing off-the-clock work, demonstrating that the written prohibition was consistently violated and generally impacted the members of the class in a similar manner." Similarly, here, while Chipotle's official policies required payment for all hours worked and included procedures for editing incorrect time punches, Plaintiffs have provided evidence showing that they suffered from Chipotle's unwritten policy of requiring hourly employees working the closing shift at the Crystal Restaurant to perform their duties off the clock, as directed by Chipotle's salaried managers, and/or due to the Aloha system. (See, e.g.,Williams Decl., Ex. F (Evenson Dep. at 36, 87-88); Ex. J (Hobbs Dep. at 29, 34-35, 44); Ex. G (Finkenaur Dep., 76-77); Ex. R (Thompson Dep. at 104-05); Ex. K (Hofschulte Dep. at 59, 64); Ex. B (Austin Dep. at 57-

58); Ex. T (Xiong Dep. at 19, 37); Ex. C (Briggs Dep. at 73); see also Ex. XX (Daher Interrog. Resp. No. 3); Ex. YY (Dilliard Interrog. Resp. No. 3); Ex. ZZ (Sumrall Interrog. Resp. Nos. 3, 14 and 15); Ex. AAA (Williams Interrog. Resp. No. 3); Ex. BBB (Jones Interrog. Resp. No. 3).)

Chipotle also argues that any off-the-clock work stemmed from scattered and unrelated causes, such that no single, common policy was responsible. (Def.'s Mem. Supp. Mot. to Decertify at 20-22) (citing Sargent v. HG Staffing, 171 F. Supp. 3d 1063 (D. Nev. 2016); Lindsay v. Clear Wireless LLC, No. 13-834 (DSD/FLN), 2016 WL 916365, at *2 (D. Minn. Mar. 10, 2016); White v. 14501 Manchester Inc., 301 F.R.D. 368 (E.D. Mo. 2014)). For example, Chipotle points to Named Plaintiff Harris' testimony that he was directed to work off the clock by managers/Named Plaintiffs Evenson and Caldwell, (Gleason Decl., Ex. B (Harris Dep. at 83-84)), whereas Opt-In Plaintiff Dubon Rivas testified that she worked off the clock due to the Aloha reset any time that she worked the closing shift. (Gleason Decl., Ex. N (Dubon Rivas Dep. at 27-28).)

The Court finds that the off-the-clock work in question was not so varied as to warrant decertification. The conditional FLSA collective conditionally certified by this Court encompasses both types of work: the collective consists of current and former employees at the Crystal Restaurant, during the relevant period, who were either punched off the clock at 12:30 by the Aloha system and continued to work or who otherwise worked "off the clock" during closing shifts. (Order of 9/9/14 at 31.) Moreover, the authority cited by Defendant is distinguishable from the facts of this case. Indeed, a

violation of an "overarching policy of suffering or permitting work without compensation" may be insufficient to establish similarity among plaintiffs, particularly where numerous, individual factors led to the violation occurring "in many different ways, by different managers, at different times, and in different assignments and locations." Sargent, 171 F. Supp. 3d at 1079-80. But in Sargent, the plaintiffs worked in over 50 different departments and sub-departments, and in more than 70 different positions. Id. at 1081. Similarly, the collective in Lindsay included 127 mall kiosk retail representatives and national retail account executives, none of whom could identify a uniform policy or practice, written or otherwise, requiring off-the-clock work. 2016 WL 916365, at *1-5. In White, a collective action asserting unlawful tip-sharing claims, the court found that the plaintiffs' alleged policy or plan varied widely from store to store, from manager to manager, in the percentage of the tip to be shared, and the persons with whom the tip was to be shared. 301 F.R.D. at 373. The facts here, however, are limited to a single store, a single shift, and to a relatively small number of plaintiffs who worked in generally three positions (crew member, kitchen manager, and service manager), for a limited number of general managers and apprentice managers. The alleged policy or plan–nonpayment for work on the closing shift–is the same. Under these facts, where there is evidence of a common unwritten policy, decertification is not appropriate.

## 2.      Factual and Employment Settings

Chipotle argues that a collective action is inappropriate in light of differing reasons among Plaintiffs for the off-the-clock work and the different nature of the work. (Def.'s

Mem. Supp. Mot. to Decertify at 25.)  It notes that the alleged FLSA violations are attributable to the following varied reasons or varied nature of the work:  (1) the Aloha system reset; (2) pre-shift work performed off the clock; (3) managerial requests to clock out early and continue working; (4) being assigned additional cleaning duties as punishment; (5) "voluntary cleaning parties"; and (6) working off the clock on days off to demonstrate loyalty.[6]  (Id.)  Because Plaintiffs' FLSA claims concern off-the-clock work performed during the closing shift, four types of work identified by Chipotle are not encompassed by this conditionally certified collective:  pre-shift work performed off the

---

[6] Further, Chipotle argues that in response to this motion, Plaintiffs attempt to "manipulate the scope" of the conditionally certified collective by limiting it to persons who worked off the clock, at the direction of salaried managers.  (Reply at 6-7) (emphasis added).  Chipotle contends that Plaintiffs do so in order to ignore varied evidence among Plaintiffs and to "conveniently" support their theme that the alleged violations occurred in order to reduce labor costs.  (Id. at 8.)  But Plaintiffs make no such argument limiting the scope of the collective.  (See Pls.' Opp'n Mem. at 2-4 [Doc. No. 393].)  Rather, in the portion of Plaintiffs' memorandum cited by Chipotle, Plaintiffs make factual assertions:

> Because Chipotle required hourly-paid closing shift employees (crew and supervisors alike) to stay and help each other until all tasks were completed, collective members did not merely perform similar duties–they literally performed the same duties during every closing shift.  Collective members (crew and supervisors alike) testified to being required to complete their closing duties (i.e., putting away food, closing the cash register, and cleaning) off-the-clock, at the direction of salaried managers.

(Pls.' Opp'n Mem. at 2) (emphasis in original).  In this passage, Plaintiffs are not discussing the legal parameters of the collective, but summarizing a portion of their evidence.  As Defendant itself acknowledges, (Def.'s Reply at 6), in describing the collective, Plaintiffs quote verbatim the Conditional Certification Order, noting that it is limited to "(1) off-the-clock' work (2) at the Crystal, Minnesota location (3) during closing shifts."  (Pls.' Opp'n Mem. at 4.)  Plaintiffs do not mischaracterize the scope of the collective.

clock, additional work assigned as punishment, "voluntary cleaning parties," and working

on days off.

The Court finds that the factual and employment settings factor supports the denial

of Defendant's decertification motion. The class members here worked at a single

location, performing the same duties: cleaning, counting money, prepping food, locking

up, and attending Chip Talk meetings. They were likewise subject to the same off-the-

clock policies. Chipotle again cites Lindsay, 2016 WL 916365, at *5, as well as Douglas

v. First Student, Inc., 888 F. Supp. 2d 929, 934 (E.D. Ark. 2012), in support of its

argument that differences in employees' duties or off-the-clock experiences warrants a

finding of disparate factual and employment settings of the individual Plaintiffs here. As

noted earlier, in Lindsay, not only were the nationwide class members unable to identify a

common plan or policy, there was, among other things, no consistency among plaintiffs

regarding the kinds of off-the-clock work performed: "This is not a case where plaintiffs

were required to do the same work without pay, like donning and doffing protective gear,

booting up the computer before punching in, or working through lunch without pay."

2016 WL 916365, at *5. Likewise, in Douglas, while the class of plaintiff bus drivers was

limited to a particular location, the drivers performed a variety of different tasks, including

non-driving duties, of varying lengths, all of which varied from driver to driver. 888 F.

Supp. 2d at 935. That is not the case here.[7]

---

[7] In its initial brief, Chipotle further provides a two-page string cite for the proposition that federal courts have frequently granted decertification motions "where the reasons for, and the nature of, the off-the-clock allegations vary from plaintiff to plaintiff,

Further, Chipotle argues that the evidence shows "dramatic variations" in the amount of off-the-clock work performed.  (Def.'s Mem. Supp. Mot. to Decertify at 26.)

As this Court observed in Cruz v. TMI Hospitality, Inc., No. 14-cv-1128 (SRN/FLN),

_____

as they do here."  (Def.'s Mem. Supp. Mot. to Decertify at 31.)  However, the facts of these cases are inapposite.  In Mendez v. U.S. Nonwovens Corporation., No. CV-12-5583 (ADS) (SIL), 2016 WL 1306551, at *5-6 (E.D.N.Y. Mar. 31, 2016), the plaintiffs themselves offered varied testimony concerning the employer's timekeeping system, "merely put[ting] forth anecdotal evidence of individual failures in the system, not proof of a company-wide policy or practice."  Similarly, in Cornell v. World Wide Business Services Corporation, No. 2:14-cv-27, 2015 WL 6662919, at *3-4 (S.D. Ohio Nov. 2, 2015), among the court's reasons for finding varied employment and factual settings was that plaintiffs conceded that their time records rebutted their off-the-clock allegations and they provided no other evidence in support of them.  The court in Kelly v. Healthcare Services Group, Inc., No. 2:13-cv-00441-JRG, 2015 WL 3464131, at *3-4(E.D. Tex. June 1, 2015), granted decertification, citing a lack of "any factual support (either by testimony or a common, company-wide policy or plan) for the allegation that account managers were required to actually clock in to work before their shift began or to actually clock out after their shift ended."  In a nationwide collective of 437 bankers, Ruiz v. Citibank, N.A., 93 F. Supp. 3d 279, 299-300 (S.D.N.Y. 2015), the court granted decertification because, among other things, evidence concerning the opt-in plaintiffs showed "massive disparities" as to the overtime policies of branch managers at hundreds of banks.  In Hamilton v. Diversicare Leasing Corporation, No. 1:12-cv-1060 (SOH), 2014 WL 4955799, at *4 (W.D. Ark. Oct. 1, 2014), the court determined that the plaintiffs' evidence concerning a de facto policy of uncompensated meal breaks "varied greatly," there was no evidence that nurses, housekeepers, maintenance, and payroll employees performed similar job duties, and the only evidence of a de facto policy applied only to employees in one of eight states.  In Mathis v. Darden Restaurants, No. 12-61742-CIV (WPD), 2014 WL 4428171, at *4 (S.D. Fla. Sept. 1, 2014), the court decertified a collective of 20,000 opt-in plaintiffs, stating that the "relevant policies and practices as to the off-the-clock work and wages differ by job title, state, [brand], specific restaurants, and manager," giving rise to a variety of claims.  Similarly, decertification was granted by the court in Desilva v. North Shore-Long Island Jewish Health System, Inc., 27 F. Supp. 3d 313, 323-24 (E.D.N.Y. 2014), because the evidence demonstrated that the 1,196 opt-in plaintiffs held 235 different positions, working both on-site and off-site under different compensation policies, using various methods of time recording, and had varied methods for recovering for automatically deducted meal breaks.  The types of differences noted in these cases are not present here.

2015 WL 6671334, at *15 (D. Minn. Oct. 30, 2015), this type of discrepancy has been

"repeatedly held by judges in this District to be inconsequential." (citing Brennan, 2009

WL 1586721, at *2; Frank v. Gold'n Plump Poultry, Inc., No. 04-cv-1018 (PJS/RLE),

2007 WL 2780504, at *1 (D. Minn. Sept. 24, 2007)). Moreover, such differences may be

adequately addressed through damages. See Cruz, 2015 WL 6671334, at *17 (stating that

simply because the plaintiffs' individual circumstances may be considered in order to

calculate damages, that does not "render collective adjudication of liability improper,"

where the calculations do not "'overwhelm questions common to the class.'") (quoting

Bouaphakeo, 765 F.3d at 798 n.5) (citation omitted). As in Cruz, the Court finds that any

individual inquiries here concerning the amount of off-the-clock work do not overwhelm

questions common to the collective.

In addition, Chipotle cites declarations from non-Plaintiffs, i.e., other Chipotle

employees who worked at the Crystal Restaurant, who testified that they did not perform

any off-the-clock work. (Def.'s Mem. Supp. Mot. to Decertify at 16-17) (citing Beebe

Decl. ¶¶ 5, 12, 14-15 [Doc. No. 250]; Ceron Decl. ¶¶ 5, 11, 13-15 [Doc. No. 251];

Hawkins Decl. ¶¶5, 11, 13-15 [Doc. No. 253]; J. Hernandez Decl. ¶¶ 5, 11, 14-16 [Doc.

No. 254]; Borja-Granizo Decl. ¶¶ 5, 11, 13-15 [Doc. No. 252]; Reyes-Jimenez Decl. ¶¶ 5,

11-14 [Doc. No. 255].) However, as noted in Brennan, "[t]he central question at issue in

the decertification motion is whether the named plaintiffs and opt-in plaintiffs are similarly

situated, not whether the FLSA was violated." 2009 WL 1586721, at *5 (citations

omitted). Chipotle itself acknowledges as much. (Def.'s Mem. Supp. Mot. to Decertify at

16) (prefacing its citations to the non-Plaintiffs' declarations with the acknowledgment that "on this Motion the Court primarily considers the testimony of Named Plaintiffs and Opt-Ins.")  While such evidence may be relevant on the merits, as noted earlier, the merits of Plaintiffs' claims are not considered on a decertification motion.  <u>Nerland</u>, 564 F. Supp.2d at 1019 (citations omitted).

For all of the foregoing reasons, the factual and employment settings factor weighs in favor of trying Plaintiffs' claims together.

### 3. Available Defenses

Chipotle next argues that decertification is warranted due to its need to assert six individualized defenses against certain Named Plaintiffs and Opt-In Plaintiffs, but not others.  (Def.'s Mem. Supp. Mot. to Decertify at 27.)

First, Chipotle argues that because some Plaintiffs contend that they worked off-the-clock due to the Aloha reset, "without any allegation that the work was performed at the direction of, or with the knowledge of, a manager, . . . [t]he ability of a Plaintiff to establish that Chipotle had actual or constructive knowledge of such a circumstance will be more remote than a Plaintiff alleging that the off-the-clock work occurred at the direction, and with the knowledge of, a manager."  (<u>Id.</u>) (citation omitted).  As this Court observed in <u>Cruz</u>, however, "whether Defendant[ ] had notice is a question that pertains to the entire class."  2015 WL 6671334, at *17.  Accordingly, the Court finds that this does not render a collective action unmanageable.

Second, and similar to the defense noted above, Chipotle argues that Plaintiffs do

not identify a single manager as being responsible for issuing off-the-clock directives. (Def.'s Mem. Supp. Mot. to Decertify at 28.) Consequently, Defendant contends, each Plaintiff must show that Chipotle had actual or constructive knowledge regarding the respective managers. (Id.) Again, because the question of whether Chipotle had notice pertains to the entire class, and because the number of managers at the Crystal Restaurant whom Plaintiffs have identified as directing off-the-clock work is quite small, this defense does not warrant decertification.

Third, Chipotle argues that "[g]iven the paucity of evidence concerning the type of work allegedly performed off the clock, Chipotle can argue that the activities of certain Plaintiffs did not constitute compensable work." (Id.) (citing Brown v. ScriptPro, LLC, 700 F.3d 1222, 1230 (10th Cir. 2012)). From a factual standpoint, this argument overlooks the generally consistent testimony describing the type of off-the-clock work Plaintiffs performed during closing shifts which included cleaning, counting money, prepping food, locking up, and attending Chip Talks. (See, e.g., Williams Decl., Ex. D (Caldwell Dep. at 89-91); Ex. N (Ortega Dep. at 45, 48, 51-53); Ex. L (James Dep. at 41, 58-59, 65); Ex. S (Washington Dep. at 39-40, 45, 47-48, 62); Ex. F (Evenson Dep. at 66, 71-72); Ex. G (Finkenaur Dep. 49-50); Ex. C (Briggs Dep. at 45, 57, 67-69); Ex. K (Hofschulte Dep. at 47); Ex. T (Xiong Dep. at 26, 31); Ex. P (Ramirez Dep. at 116-17); Ex. J (Hobbs Dep. at 47-48); Ex. E (Dubon Rivas Dep. at 37-38).) And from a legal standpoint, Brown is wholly inapposite here. In Brown, the Tenth Circuit affirmed the district court's summary judgment ruling that the plaintiff had not met his burden of

establishing a genuine issue of disputed fact as to whether he performed uncompensated work.  700 F.3d at 1230.  Also, <u>Brown</u> concerned an individual plaintiff who sued his employer under the Family Medical Leave Act, FLSA, and Title VII–the case was not a FLSA collective action.  Again, the merits of Plaintiffs' claims are not before the Court on a decertification motion.  <u>Nerland</u>, 564 F. Supp.2d at 1019 (citations omitted).  This defense does not make collective resolution unmanageable.

Fourth, Chipotle contends that because Plaintiffs presented "speculative testimony" regarding the amount of alleged off-the-clock work performed, Chipotle can assert a *de minimis* defense against some Plaintiffs, but not others.  (Def.'s Mem. Supp. Mot. to Decertify at 28.)  As this Court observed in <u>Cruz</u>, however, "although there may be discrepancies in the amount of time each Plaintiff worked off the clock on a given day, or when, those discrepancies are inconsequential."  2015 WL 6671334, at *16.  The Court will not decertify on this basis.

Fifth, again citing <u>Brown</u>, 700 F.3d at 1230, Chipotle argues that "some Plaintiffs are precluded, as a matter of law, from succeeding on their claims in light of their failure to utilize Chipotle's procedures for accurately recording hours or remedying errors." (Def.'s Mem. Supp. Mot. to Decertify at 28.)  Again, the court in <u>Brown</u> affirmed summary judgment for Mr. Brown's employer on a FLSA overtime claim where, among other things, the plaintiff failed to show the amount of overtime by a justifiable or reasonable inference.  700 F.3d at 1230.  The court further noted that where an employee fails to notify the employer of his overtime hours through an established overtime

timekeeping system, as was the case in <u>Brown</u>, there is no FLSA overtime violation. <u>Id.</u> (citing <u>Harvill v. Westward Commc'ns, LLC</u>, 433 F.3d 428, 441 (5th Cir. 2005)). For the reasons stated above, <u>Brown</u>–an opinion on summary judgment involving an individual plaintiff–is inapplicable to this decertification motion. And while the merits of Plaintiffs' claims are not at issue here, <u>Nerland</u>, 564 F. Supp.2d at 1019 (citations omitted), courts have also observed that where the employer prevents the employee from reporting overtime or is otherwise notified of the unreported work, the employer "is still on the hook for unpaid overtime." <u>Craig v. Bridges Bros. Trucking LLC</u>, 823 F.3d 382, 389 (6th Cir. 2016) (citing <u>White v. Baptist Mem. Health Care Corp.</u>, 699 F.3d 869, 877 (6th Cir. 2012) (noting that for the plaintiff to recover under the FLSA, she must show that her employer prevented her from using the system for reporting entirely or partially missed meal breaks)). This defense does not preclude proceeding with this matter as a collective action.

Sixth, Defendant argues that because two of the Named Plaintiffs–Harris and Caldwell–are convicted felons, Chipotle may be able to assert credibility arguments with respect to them, but not against other members of the collective. Harris was convicted of aggravated robbery, for which he served 15 years in prison. (Gleason Decl., Ex. A (Harris Dep. at 9-10).) Caldwell was convicted of felonies including sexual conduct with a minor. (Gleason Decl., Ex. B (Caldwell Dep. at 10-12).) He spent 11.5 years in prison and is a registered sex offender. (<u>Id.</u>)

In <u>Cantu v. Milberger Landscaping, Inc.</u>, No. SA-13-CA-731, 2014 WL 1413500,

at * 1-2 (W.D. Tex. April 3, 2014), the court addressed essentially the same argument on decertification, as criminal convictions or allegations of criminal behavior applied to two of the named plaintiffs. While the defendant-employer there cited three district court cases for the proposition that the credibility of lead plaintiffs is an important factor in determining whether a case should proceed as a FLSA collective action, the court distinguished those cases as arising under Fed. R. Civ. P. 23. Unlike Rule 23 class actions, collective actions under the FLSA require plaintiffs to opt in. Id. Therefore, the court reasoned, "[i]f the named Plaintiffs' testimony is called into question, the remaining 'opt-in' Plaintiffs would be able to supplement that testimony and protect their interests." Id. (citing Roussell v. Brinker Int'l, 441 Fed. App'x 222, 227 (5th Cir. 2011)). The court concluded that the named plaintiffs' "peccadillos" were matters of credibility for the factfinder, not individualized defenses weighing in favor of decertification. Id. at *2. And, "[m]ost importantly, these peccadillos have little to do with the issue at hand–namely, whether the Defendants's pay practices complied with the FLSA." Id. Relying on Cantu, the court in Sloan v. Gulf Interstate Field Servs., Inc., No. 15-1208, 2016 WL 878118, at *7 (W.D. Pa. Mar. 8, 2016), rejected the same argument from an employer, albeit in the context of conditional certification. The Court agrees with the reasoning in these cases and finds that the criminal histories of Harris and Caldwell are credibility issues for the factfinder. And as the courts in Cantu and Sloan observed, the criminal convictions have little to do with the question of Chipotle's compliance under the FLSA. Accordingly, the court finds that the criminal histories of Harris and Caldwell do

not weigh in favor of decertification.

### 4.    Fairness and Procedural Considerations

Finally, the Court must consider the evidence in light of the remedial purpose of the

FLSA.   In doing so, the Court must "balanc[e] the benefits of a reduction in the cost to

individual plaintiffs, and any increased judicial utility that may result from the resolution

of many claims in one proceeding, with the cost of any potential detriment to the

defendant and the potential for judicial inefficiency that could stem from collective

treatment."  Nerland, 564 F. Supp. 2d at 1025 (citing Hoffmann–La Roche, 493 U.S. at

170).

Chipotle argues that any efficiencies to be gained by proceeding with this action as

a collective must give way to the unfairness to be inflicted upon it.  (Def.'s Mem. Sup.

Mot. to Decertify at 30.)  Specifically, Chipotle asserts that "the potential for unfairness to

Chipotle in a trial by representative proof is overt," citing the testimony of two Opt-In

Plaintiffs, who purportedly testified that they "may likely not have worked any hours off

the clock without compensation," as well as the declarations of non-Plaintiffs who attest

that they never worked off the clock.  (Id.)  However, the cited testimony of the two Opt-

In Plaintiffs plainly does not support that proposition.  To the contrary, Opt-In Plaintiff

Dubon Rivas testified that she worked off the clock at the Crystal Restaurant any time that

she worked the closing shift (Gleason Decl., Ex. N (Dubon Rivas Dep. at 27-28)), and

Opt-In Plaintiff Xiong testified that during the evening shift, employees were

automatically clocked out at 12:30 a.m. and continued to work until the completion of

their tasks.  (Gleason Decl., Ex. O (Xiong Dep. at 12).)  As to the different experiences of non-Plaintiffs, such evidence may be relevant at trial when the merits of Plaintiffs' claims are at issue, but not on a motion to decertify, where the focus is on the similarities, or differences, between the Named Plaintiffs and Opt-In Plaintiffs.

Plaintiffs assert that fairness and procedural considerations weigh in favor of collective adjudication because the most important issues are common to all plaintiffs and are subject to collective proof.  (Pls.' Opp'n Mem. at 35.)  On the other hand, they argue, if the case is decertified, the cases will be tried separately.  (Id.)  Because each of the Plaintiffs has relatively small claims, Plaintiffs contend that forcing them to proceed on an individual basis would be impractical and contrary to the purpose of the FLSA.  (Id.)

The Court agrees with Plaintiffs.  The main issues in this case are amenable to classwide resolution.  Thus, a collective action to resolve Plaintiffs' claims in one proceeding will be a more efficient means of resolution than to proceed with individual trials and will also serve the interests of judicial economy.  Also, because it appears that many of the Plaintiffs have relatively small claims, it would be impractical for them to pursue individual claims.  Requiring them to do so "could have the effect of contravening the remedial nature of the FLSA."  Brennan, 2009 WL 1586721, at *7.  This final factor therefore weighs in favor of allowing this matter to proceed as a collective action.

### B. Conflicts of Interest

Chipotle argues that conflicts of interest among Plaintiffs provide an independent basis for decertification.  For instance, because Named Plaintiffs Caldwell and Evenson

and Opt-In Plaintiffs Londo and Xiong worked as hourly kitchen managers and/or service managers, Chipotle argues that they are among the employees who directed other Plaintiffs to perform off-the-clock work. Thus, Chipotle contends that not only are Plaintiffs not similarly-situated, but their interests are in conflict. Plaintiffs argue, however, that no such conflict compels decertification.

Chipotle cites White v. Osmose, Inc., 204 F. Supp. 2d 1309, 1314 (M.D. Ala. 2002), in which the named plaintiff, a foremen, proposed to represent a conditional collective that would include both foremen and crewmen, who were supervised by foremen. The court there found that a foremen could not represent a combined collective of foremen and crewmen because their job duties were "markedly dissimilar" and there was an "inherent conflict of interest between them." Id. Not only did the foremen perform a variety of administrative duties that crewmen did not, foremen had an economic incentive to under-report their crew's work hours, as they received bonuses for efficiency. Id. (citing Herman v. RSR Sec. Servs., 172 F.3d 132 (2d Cir. 1999) (applying an "economic reality" test in determining that a chairman qualified as an "employer" for purposes of FLSA liability)). The court therefore denied conditional certification of the combined foremen-crewmen collective, but conditionally certified a smaller group of foremen, working in Alabama. Id. at 1315-17. In contrast to the facts in White, here, the evidence shows that kitchen managers, service managers, and crew members performed generally the same duties on closing shift. (See, e.g., Williams Decl., Ex. D (Caldwell Dep. at 89-91); Ex. N (Ortega Dep. at 45, 48, 51-53); Ex. L (James Dep. at 41, 58-59, 65);

Ex. S (Washington Dep. at 39-40, 45, 47-48, 62); Ex. F (Evenson Dep. at 66, 71-72); Ex. G (Finkenaur Dep. 49-50); Ex. C (Briggs Dep. at 45, 57, 67-69); Ex. K (Hofschulte Dep. at 47); Ex. T (Xiong Dep. at 26, 31); Ex. P (Ramirez Dep. at 116-17); Ex. J (Hobbs Dep. at 47-48); Ex. E (Dubon Rivas Dep. at 37-38).)   Kitchen managers and service managers stayed late to help crew members finish the closing duties.  (Williams Decl., Ex. T (Xiong Dep. at 30-31).)  To the extent that hourly managers performed some administrative duties, the Court finds this to be a minor distinction.  Nor does Chipotle point to evidence showing that managers received financial incentives for keeping employees off the clock during closing shifts.

Defendant also cites Howard v. Gap, Inc., No. C 06-06773 WHA, 2009 WL 3571984, at *6 n.3 (N.D. Cal. Oct. 29, 2009), in which the court declined to conditionally certify a Rule 23 class action that included both non-exempt managers and the employees working at their direction.  Among several reasons for the court's decision, it noted that the class was not similarly situated as it included non-exempt managers whose allegedly FLSA-violating practices the employees would be challenging as class members.  Id.  The limited discussion of this "conflict," found in a footnote in the court's discussion of Rule 23's typicality requirement, however, provides little analytical guidance.  Also, Howard arose in the context of a Rule 23 class action, for which certification bears some similarity to FLSA certification, but is not perfectly analogous.

Rather, as Plaintiffs note, opinions on decertification often involve collectives that include both hourly employees and supervisors.  (Pls.' Opp'n Mem. at 42, n.85) (citing

LaFleur, 30 F. Supp. 3d at 470-71 (denying decertification motion and finding that despite including "both victims and perpetrators of the alleged FLSA violations," differences in hours and wages did not undermine similarities within the conditionally certified collective); and O'Brien, 575 F.3d at 586 (affirming the district court's decertification, but stating, "A final word on the parties' less persuasive points. Defendants note that some of the plaintiffs were managers and therefore could not be 'similarly situated.' This is not a compelling argument, because managers could also have been cheated by defendants.")).

In Jones v. Cretic Energy Servs., LLC, 149 F. Supp. 3d 761 (S.D. Tex. 2015), the court, addressing conditional certification, found that potential members of the FLSA collective, which included coil tubing operators as well as supervisors, were similarly situated to the named plaintiff, a coil tubing operator. The court explained:

> The evidence before the court shows that members of Cretic's coil tubing field crews worked the same hours side-by-side as a team, traveling from job site to job site, and spending most of their time physically operating and maintaining coil tubing equipment in oilfields. The fact that each crew had a supervisor responsible for overseeing its operations, and that defendant considered supervisors subject to a different FLSA exemption than that to which they considered operators exempt, does not require the court to conclude that coil tubing crew supervisors are not similarly situated to the operators they oversee. Employees with different job titles are similarly situated for the purpose of an opt-in FLSA class when their day-to-day job duties do not vary substantially.

Id. at 772 (citing Aguirre v. SBC Commc'ns, Inc., No. H-05-3198, 2007 WL 772756, at *12 (S.D. Tex. March 12, 2007)). The evidence here shows that kitchen and service managers working the closing shift worked as a team with crew members, largely performing the same tasks. (See Williams Decl., Ex. D (Caldwell Dep. at 89-91); Ex. N

33

(Ortega Dep. at 45, 48); Ex. L (James Dep. at 58-59, 65); Ex. S (Washington Dep. at 39-40, 45); Ex. F (Evenson Dep. at 66); Ex. G (Finkenaur Dep. 49-50); Ex. C (Briggs Dep. at 67-69); Ex. K (Hofschulte Dep. at 47); Ex. T (Xiong Dep. at 26, 31).)  The Court is satisfied that there is no conflict of interest among the Plaintiffs that merits decertification.

### C.     Conclusion

Based on the foregoing analysis, the Court finds that the Named Plaintiffs and Opt-in Plaintiffs are similarly situated for purposes of pursuing their claims in a FLSA collective action.  "And to the extent that the question presents a close call, concerns for the purposes of the FLSA as a remedial statute tip the balance decidedly against decertification."  <u>Brennan</u>, 2009 WL 1586721, at *7.  Defendants' Motion is, therefore, denied.

**THEREFORE IT IS HEREBY ORDERED THAT:**

1.      Defendant's Motion to Decertify the Conditionally Certified Class [Doc. No. 244] is **DENIED**.

Dated:    June 12, 2017

s/Susan Richard Nelson
SUSAN RICHARD NELSON
United States District Court Judge