**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---------------------------------------------------

|  |  |  |
|---|---|---|
| Marcus Harris, Julius Caldwell, Demarkus Hobbs, and Dana Evenson, on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) ) | Case No. 13-cv-1719 (SRN/SER) |
| v. | ) ) | |
| Chipotle Mexican Grill, Inc., | ) ) | |
| Defendant. | ) ) ) ) | |
| DeShandre Woodards, | ) ) | Case No. 14-cv-4181 (SRN/SER) |
| Plaintiff, | ) ) ) | |
| v. | ) ) | |
| Chipotle Mexican Grill, Inc., | ) ) | |
| Defendant. | ) ) | |

---------------------------------------------------

**SUPPLEMENTAL DECLARATION OF KENT M. WILLIAMS**

I, Kent Williams, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.      The purpose of this Supplemental Declaration is to respond to statements by Chipotle Mexican Grill, Inc. ("Chipotle") affiants John Shunk and Joseph Schmitt, provide documentation of my firm's claimed expenses, and otherwise respond to Chipotle's factual assertions. See Doc 450. All of the matters

set forth herein are true and correct to the best of my knowledge, and I have personal knowledge of the statements made herein.

2.      As explained in my original Declaration, Chipotle's conduct has greatly increased the expense of litigating off-the-clock work claims against the company. See Declaration of Kent M. Williams ("Williams Decl.") (Dkt. 450) ¶¶13-16, 19-25, 35-37, 40 (recounting Chipotle's conduct in this case). For example, Chipotle misrepresented legal authority to this Court. (See Dkt. 101 at 22-23) (September 9, 2014 Order & Opinion observing that the only case Chipotle quoted for a "substantial evidence" standard did not even use the phrase, but "repeatedly emphasized [a] lenient standard for conditional certification"). Chipotle falsely accused plaintiffs of "manipulat[ing] the scope" of the Harris collective to avoid decertification. (See Doc 423 at 20 n.6.)  And, throughout this litigation, Chipotle repeatedly accused plaintiffs and their counsel of unspecified "conflicts" warranting disqualification and other relief.  (Dkt. 87 at 26-27 (finding no conflicts); Dkt. 101at 27 (finding no conflicts)) (Dkt. 423 at 30-34) (finding no conflicts).

3.      This appears to be standard procedure for Chipotle. In Turner, Chipotle's motion for interlocutory appeal of the Court's was so ridden with deceptive and inaccurate statements that the company was admonished and threatened with sanctions.  See Turner v. Chipotle Mexican Grill, Inc., No. 14-cv-2612-JLK, 2015 WL 5579579, at *3 (D.Colo. Sept. 23, 2015) (threatening Chipotle with sanctions for filing a motion "replete with incomplete quotations,

erroneous statements of law and conjured analysis" and which lacked "the quality of the analysis, scholarship and expression" required "to meet the standards of advocacy expected and usually experienced in this district.").

4.      Unfortunately, Chipotle's opposition to our fee request is no different. It is replete with factual misstatements and omissions, mis-citations to legal authority, and other dubious support. In each such instance counsel had to investigate the record or case law at issue, determine the truth of the matter, and formulate a response, which significantly increased the total time needed to respond. Although we are not seeking additional compensation for this additional time, it means we are foregoing compensable time in excess of the 10% reduction we already made to our time.

**The Declaration of John Shunk ("Shunk Decl.")**

5.      The Shunk Declaration claims that Chipotle's employees are not disciplined or threatened for complaining about off-the-clock work, and that all complaints "are promptly investigated and resolved." The Shunk Declaration further asserts that no plaintiffs ever complained to Chipotle before filing suit or opting in to this case, but only made "informal" complaints to "low ranking managers." Shunk Decl. ¶¶ 10-11, 18. These claims are false. The uncontroverted evidence shows that plaintiffs made numerous complaints about off-the-clock work at the Crystal location, which were not investigated until early 2014, after this lawsuit was filed. *See* Dkt. 423 at 12-13 (June 6, 2017 Order and Opinion) (recounting testimony); *see also* Williams Decl. ¶ 12 (recounting the May 2012

Minnesota Department of Labor inquiry and Shunk's inaccurate response); ¶¶ 17-18 & n.3 (recounting Chipotle's internal investigation).

6.     Chipotle's counsel concedes that "while the <u>Harris</u> case was pending," Chipotle investigated allegations of off-the-clock work at the Crystal store and paid four employees more than $10,000 as a result. Shunk Decl. ¶ 13. Mr. Shunk implies this was routine, and Chipotle flatly denies that the Crystal investigation had anything to do with this case. <u>See</u> Opp. at 14-15. These assertions are false. The first sentence of the report expressly states the investigation was the result of the lawsuit. (Dkt. 398, Ex. C.)

7.     Plaintiffs' counsel are faulted for not providing notice of our clients' claims before filing suit. Shunk Decl. ¶¶ 16, 18. While pre-filing notice does sometimes help resolve a wage claim without litigation, this has not been my experience when several plaintiffs have already complained about an unlawful practice and suffered retaliation as a result. (<u>See</u> Dkt. 423 at 13-14)(recounting testimony about retaliation against Marcus Harris and others); Williams Decl. ¶ 61 (same). The notion that Chipotle would have resolved the claims is further belied by the fact that Mr. Harris continued to suffer retaliation after the suit was filed, <u>see</u> Williams Decl. ¶ 61, an established fact which Chipotle does not dispute. Nothing prevented Chipotle from attempting to resolve plaintiffs' claims after they were filed; yet Chipotle chose not to do so.

8.     Mr. Shunk claims that our motion for a collective (which was brought without the benefit of any discovery) only included evidence of off-the-

clock work at the Crystal location. Shunk Decl. ¶ 22. This is false. Plaintiffs presented evidence of off-the-clock work at other stores, but the evidence was deemed insufficient for a nationwide collective. (See Dkt. 101 at 10-12) (Sep. 9, 2014 Order & Opinion conditionally certifying collective). On August 21, 2015, District Judge John Kane deemed this and other evidence sufficient for a nationwide collective. See Turner et al. v. Chipotle Mexican Grill, Inc., No. 1:14-cv-2623 (JLK). The Turner collective currently has over 10,000 members.

9.      In recounting various motions Chipotle brought during the litigation, Shunk Decl. ¶ 27, Mr. Shunk does not mention that Chipotle lost every one of those motions (except for the motion to dismiss for failure to prosecute, but even that was only a partial victory for Chipotle, since one of those plaintiffs ended up preserving her claim). (See Dkt. 236 at 2-3.) The assertion that Chipotle often brings "two to three times" the number of motions it brought in *Harris* misses the point: each of Chipotle's depositions, worthless motions, and other actions cost more in attorney time than the damages at issue.  Magistrate Rau acknowledged as much with respect to Chipotle's motion for sanctions.[1] (Dkt.  216, 13:8-23) ("And the rules of proportionality dictate that at a certain point I got to say no because the cost that they're advancing exceed what her claim is.")

---

[1] Chipotle's assertion that Magistrate Judge Rau "cautioned Plaintiffs' counsel against continued dilatory behavior" is false. Opp. at 9. Plaintiffs' counsel were never to blame for three plaintiffs missing their depositions, and the cited transcript shows that Magistrate Rau was speaking about a hypothetical situation where one plaintiff did not appear for her deposition if it was re-noticed.

10.     Chipotle's counsel makes much of the fact that Plaintiffs' June 22, 2016 proposed Second Amended Complaint "indicated they still intended to seek class certification."  Shunk Decl. ¶ 28.  As conceded elsewhere (see Shunk Decl. ¶ 40), the proposed complaint narrowed the "statewide" class allegations to a single store (Crystal), limited claims to the closing shift, and otherwise tracked the language of the existing collective in this case.  (See Dkt. 207 at 10.) Plaintiffs' motion was denied, but we never indicated we would go back to seeking a statewide class. In fact, on the same day as the hearing, I informed Lou Grossman (one of Chipotle's counsel) that we were unlikely to seek any class because of the increasing demands of Turner.  (See Dkt. 391.) (Williams 12/18/16 letter to D.J. Nelson). As the Court later found, we even offered to stipulate that no Rule 23 motion would be brought. (See Dkt. 423.) The assertion that Chipotle had "no choice" in this litigation but to continue defending against a statewide class is false.

11.     We also are criticized for not giving "pre-suit notice" of the Woodards action.  See Shunk Decl. ¶¶ 31-32.  Chipotle did get notice when Mr. Woodards opted into the Harris case in May of 2014, and made no effort to resolve his claim. (See Dkt. 91, 91-1.)  In any event, once we learned Mr. Woodards could not assert claims in Harris, his lawsuit had to be filed quickly to avoid potential expiration of his claims (a challenge Chipotle made later in its motion to dismiss). (See Woodards Dkt. 40 at 6-8) (denying Chipotle's motion to dismiss on statute of limitations grounds). And, as with Harris, Chipotle showed

no interest in early resolution of <u>Woodards</u>. Instead, the company stipulated to coordinated discovery between the two cases and litigated for three more years. (<u>See generally</u> Dkt. 136) (Chipotle's December 12, 2014 letter proposing coordination of discovery between <u>Harris</u> and <u>Woodards</u>.).

12.    Chipotle filed a motion to dismiss claiming Mr. Woodards was "collaterally estopped" from alleging a national collective or a statewide class. Shunk Decl. ¶ 34.  Chipotle's motion was denied as moot, since Mr. Woodards had not moved for either a collective or a class. Nevertheless, two years later, Chipotle's brought <u>another</u> moot motion: a bid to "deny" Rule 23 class certification in <u>Harris</u>. Chipotle's frivolous demands on this Court are further evidence of Chipotle's wasteful "Stalingrad" defense strategy in this case.

13.    Mr. Shunk criticizes the involvement of the Bachus Schanker and Hinkle Shanor firms as unnecessary "escalation" by Plaintiffs. Shunk Decl. ¶¶ 35, 42. Adam Levy and I are solo practitioners, and our clients are minimum wage earners with finite resources. In contrast, Chipotle is a publicly-traded company worth billions of dollars, and the three firms defending the company collectively have thousands of lawyers at their disposal. For the first two years, Levy and I prosecuted this case with Ms. Calandra, Ms. O'Connor or Mr. Quisenberry (depending on who was employed at Bachus & Schanker at the time). <u>See</u> Williams Decl. ¶ 10. But, by December of 2015 (after I threatened a motion to compel), Chipotle finally was producing substantial numbers of documents for our review. We also were responding to Chipotle's written discovery (which included

7

Requests for Admission), and Chipotle had proclaimed that it intended to take the deposition of every plaintiff. We had depositions to take, too, and discovery was scheduled to end in early 2016. And, the motion for a nationwide collective had been granted in <u>Turner</u>.   Hinkle Shanor was added to assist with all of these matters.

14.    Mr. Shunk claims that "rather than prolong a dispute over many months," his firm filed a motion for an order regarding the use of confidential information in this case. Mr. Shunk further claims the matter was resolved without court intervention. Shunk Decl. ¶¶36-37. These assertions are false. When the parties reached an impasse over the proper scope of the order, the plaintiffs proposed using the Court's informal procedures for resolving non-dispositive matters, <u>see </u>Dkt. 39, but Chipotle insisted on a formal adjudication (once again, increasing the cost of the litigation). Yet, Chipotle refused to act, saying only that it would "address this with the Court as necessary." Therefore, <u>the plaintiffs</u> had to file a motion. (<u>See</u> Dkt. 157 at 3-4 & n.1) (Plaintiffs' Aug. 13, 2015 brief in support their motion for entry of confidentiality order). At the hearing, Magistrate Judge Rau rejected Chipotle's assertion of a need for "two-tiered" protection and other features normally reserved for patent cases, so Chipotle ended up stipulating to the plaintiffs' draft order with no significant changes.    (<u>See</u> Dkt. 166) (Stipulated Confidentiality Order).

15.    With respect to the discovery of Electronically Stored Information ("ESI"), Mr. Shunk claims his firm asked plaintiffs' counsel to refine their search

terms after an initial search resulted in 280,000 "hits," and that we refused. Shunk Decl. ¶¶ 38-39. This is false. In late 2015, Mr. Grossman and I agreed on a list of search terms for numerous custodians, and Chipotle produced tens of thousands of documents using those search terms. There were no "warnings" of the sort Chipotle describes (see Opp. at 12). While the production was voluminous, the documents were quite informative and they supported the plaintiffs' claims. In May of 2016, after it was discovered that several agreed-upon custodians had not been searched, Mr. Grossman and I discussed refining the list for the remaining searches. On June 1, 2016, Grossman proposed a reduced list of search terms, which I accepted on June 2, 2016.  See Ex. A attached hereto (emails).

16.    Chipotle and its counsel challenge the time spent on Plaintiffs' motion to amend the complaint to allege additional state law theories and to narrow the alleged class to the Crystal store, since Plaintiffs lost that motion. Opp. at 25; Shunk Decl. ¶¶ 40-41, Plaintiffs, however, intended to use that work product at trial, in a motion to amend the complaint to conform to the evidence (as Chipotle's counsel suggested).   See Ex. B attached hereto, at  (excerpts from transcript of hearing).  This also helped crystallize damages issues for trial.

17.    By April of 2016, there was no longer any threat to Chipotle of a nationwide collective (the Court having limited the collective to a single store collective over a year and a half earlier), and Mr. Woodards had dropped his collective and class allegations altogether. (Woodards Dkt. 77) (March 25, 2016 motion to amend). Mr. Shunk, however, claims that "Chipotle presumed that the

*Harris* plaintiffs intended to pursue their state law class action claims," because on April 22, 2016, two Hinkle Shanor attorneys requested admission *pro hac vice* to assist with the representation of the <u>Harris</u> collective. Shunk Decl. ¶ 42.  Even if this is true, Chipotle's "presumption" should have been dispelled by our June 22, 2016 proposal to narrow the alleged <u>Harris</u> class to a single store, as well as my July 6, 2016 conversation with Mr. Grossman in which I informed him it was unlikely any Rule 23 motion would be brought in <u>Harris</u>.  <u>See</u> ¶ 10, <u>supra</u>.

18.     Chipotle claims it did not pursue settlement until the eve of trial because the named plaintiffs estimated a total of $57,789 in damages in their September 26, 2014 initial disclosure. Shunk Decl. ¶ 43. The estimates were made without the benefit of any payroll records and other necessary documents from Chipotle; these documents would not be produced for another year. Thus, the figures were our best estimates based on the information we had at the time, and were subject to change (as clearly stated in the disclosure). <u>See</u> Schmitt Aff. Ex. B at 2-3. The same is true for Mr. Woodards' disclosure. <u>See</u> Shunk Decl. ¶ 47. Chipotle, however, had all of the requisite records in its exclusive possession, and even used those records months earlier to calculate back wages for the four Crystal workers it secretly paid as a result of its April 2014 investigation.[2] Thus, it could

---

[2] In its Opposition, Chipotle admits that two of the workers paid as a result of the 2014 investigation were clients of Plaintiff's counsel. Opp at 14 n.2. Chipotle further admits that Plaintiffs' counsel were not involved in any negotiations relating to the investigation. <u>Id</u>. at 15.

have responded to our September 26, 2014 disclosure with its own figures (and the records to back them up), but chose not to do so.

19.     Mr. Shunk, however, insists that "the potential liability for a nationwide collective at the rate of damages purported by the Harris plaintiffs was astronomical," which "foreclosed any possibility of resolution at that time." Shunk Decl. ¶ 43 (emphasis added). This assertion is patently false. When Chipotle received our disclosure there was no possibility of a national collective in Harris, because this Court had declined to certify a national collective three weeks earlier. See Dkt. 101 (September 9, 2014 Order & Opinion).

20.     We also are faulted for not serving a demand until September of 2016. Shunk Decl. ¶¶ 45-46. We did not serve a demand before then because Chipotle did not produce the documents needed to calculate damages until December of 2015. It took considerable time to compare clock-out times to alarm records and calculate stolen wages for 28 workers, while accounting for wage differences, overtime, Chip Talks, gap time issues, and other factors. We also had to review liability documents, fight over Chipotle's privilege log, defend dozens of plaintiff depositions, take the depositions of Chipotle's managers, respond to Chipotle's motions, and answer Chipotle's requests for supplemental discovery during this period.

21.     The true reason for Chipotle's strategy can be found in the response Chipotle's counsel to a direct question by the Court about Chipotle's "extremely aggressive" defense in this case:

11

MR. GROSSMAN: Your Honor, at this point, as I'm sure you can appreciate, this case has tremendous precedent-setting value to our client with respect to the numerous other similar cases that we're defending in other jurisdictions. Rulings from this Court can be flatted against us in other matters. It is incumbent upon us as counsel to zealously defend Chipotle's interests.

See Exhibit B attached hereto, at 42:5-11.

22.     Therefore, the claim that Chipotle would have engaged in settlement negotiations if only we had presented Chipotle with "accurate and reasonable damages calculations" is false. See Shunk Decl. ¶ 48. If the Court has any remaining doubt about this issue, observe how Chipotle reacted after August 6, 2016, the day it received our damages calculations showing total single damages of $21,000 for both cases. Rather than pursue settlement, the company demanded supplemental discovery from the plaintiffs, gathered hundreds of "happy camper" affidavits from Chipotle employees across Minnesota, launched an all-out assault on both class and collective certification, stonewalled at the court-ordered mediation, and prepared for trial. Time spent on these activities obviously exceeded the damages in this case, but Chipotle rolled the dice anyway, hoping to obtain a favorable ruling it could use in similar FLSA litigation in other states. Chipotle did not express a serious desire to settle until July of 2017, when it ran out of continuances and faced an immovable trial date (and then paid a premium to avoid).

23.     Chipotle's game-playing continued as we tried to complete the settlement documents. Chipotle sat on a draft settlement agreement for weeks,

only to announce the night before the agreement was due that several open items had yet to be resolved. (Dkt. 438). After a series of extensions, the Court instructed the parties to file the settlement agreement and related documents by August 29, 2017, or explain why not. (Dkt. 445.) On August 28, I asked Chipotle to agree that named plaintiff service awards be paid out of our fees; Chipotle insisted on language stating it opposes the awards (which it now says it does not oppose). The parties were in the process of finalizing the settlement papers when Chipotle made a new demand: the plaintiffs and their counsel must agree not to speak to anyone about the settlement. We refused. The impasse dragged on into the evening of August 29 (with plaintiffs' counsel and their staff waiting for hours to begin the ECF uploading process) before Chipotle finally agreed to raise the issue in a separate motion. See Dkt. 464. Chipotle never brought the motion.

### The Joseph Schmitt Declaration ("Schmitt Decl.")

24.     Joseph Schmitt opines that the hourly rates of counsel are unreasonable. Schmitt Aff. ¶¶ 21-26. Although Mr. Schmitt claims he is "generally familiar" with rates in this area, he does not cite any particular rates (including his own, or those of Chipotle's other fifteen lawyers in this case).[3]

---

[3] The following lawyers have represented Chipotle in this case: 1) John Shunk, 2) Andrew Smith, 3) Richard Simmons, 4) Bruce Manning, 5) Joel Mintzer, 6) Jennifer Robbins, 7) Angela Munoz-Kaphing, 8) Allison Dodd, 9) Lou Grossman, 10) Jeffrey Gleason, 11) Scott Evans, 12) Adam Royval, 13) Kendra Beckwith, 14) Douglas Wolanske, and 15) Thomas Blackburn. This list does not include Joseph Schmitt, Bryant "Corky" Messner, or Chris Madel, each of whom also participated in this case on Chipotle's behalf.

Instead, he relies upon excerpts from surveys (none of which appear to be limited to the Twin Cities area) showing "average" and "median" rates with a high of $460 for partners and $344 for associates, which are significantly lower rates than those of plaintiffs' counsel.

25.     Although none of Chipotles' counsel provide their own rates for comparison, in Ewald, Robins Kaplan LLP attorney Eric Magnuson previously reported to this Court that 1) a 2011 Price-Waterhouse survey showed the range of hourly rates in the Twin Cities is $325-725 for partners and $256-277 for 8-year associates; 2) in contingent cases where hourly rates are used, Robins Kaplan charges an hourly rate of $475-700; and 3) contingent hourly rates of plaintiff's counsel normally exceed the billed hourly rates of defense counsel. See Ex. C attached hereto at ¶¶ 5-7. Moreover, in the only pertinent FLSA case we found in this District in which Mr. Schmitt was involved, he agreed to a top hourly rate of $525 for plaintiffs' counsel. See Latira Burnip, et al. vs. HMSHost Corporation and Host International, Inc., Case No. 15-cv-01543 (Dkt. 84-1, 85) (August 1, 2016 Declaration of Reena I. Desai Exhibit A) (attached hereto as Exhibit D).

26.     Mr. Schmitt also challenges the hours spent on certain tasks, the compensability of certain tasks, and other aspects of our lodestar, without delineating the specific entries at issue. For example, with respect to the motion for motion for conditional certification of a collective, Mr. Schmitt refers to "51 entries" that should be reduced. Schmitt Aff. ¶¶ 28, 32. Inexplicably, at one point Mr. Schmitt claims these entries total 304.5 hours, see ¶ 28, but later claims they

total 239.3 hours, <u>see</u> ¶ 32. Mr. Schmitt also faults us for "64 entries" related to Chipotle's objection to Magistrate Judge Rau's April 10, 2014 Report and Recommendation. Schmitt Aff. ¶ 34. Mr. Schmitt does not list the entries he is talking about (much less identify unrelated tasks that should be excluded), making any particularized response difficult if not impossible. This fundamental problem permeates the entirety of Mr. Schmitt's affidavit.

27.     Adjudicating the motion for conditional certification involved significant investigation, briefing, declarations, exhibits, supplemental briefing, oral argument, and an objection which also was briefed and also had supplemental briefing. <u>See</u> Williams Decl. ¶¶ 12-16.  Also, this is when Chipotle began asserting "conflicts" among the plaintiffs, which required additional briefing. <u>Id</u>. ¶ 15. The fact that Chipotle's "conflict" accusations were rejected twice (Dkt. 87 at 26-27) (finding no conflicts) (Dkt. 101at 27) (finding no conflicts) did not deter Chipotle from raising them again, two years later, only to see the accusations rejected a third time. (Dkt. 423 at 30-34) (finding no conflicts). In any event, Mr. Schmitt identifies no unrelated tasks to be excluded, but simply asserts that the total time is "excessive."

28.     Mr. Schmitt points to a few entries (totaling about 3 hours) in which I discussed the litigation with potential opt-ins from other states. Mr. Schmitt argues this time should not be paid because <u>Harris</u> was a single-store collective in Minnesota.  Information from workers in other states was still valuable, however, because it helped confirm that Chipotle sets individual stores' labor budgets at the

corporate level, and exerts heavy pressure on store managers to meet those budgets. This information helped guide further discovery efforts, including specific search terms that located thousands of relevant documents.

29.     Mr. Schmitt contends  we should not be paid for time spent working on the motion for leave to file a second amended complaint. Id. But this time should be compensated because, as explained above, plaintiffs intended to file a motion to conform the complaint to the evidence at trial. See ¶ 16 supra. Since the research and briefing on state law claims already had been done, it saved us from having to do it as part of our trial preparation in May and June of 2017.

30.     Mr. Schmitt claims we spent too much time on the "Rule 26(f) process." Id., ¶ 29. Again, he does not identify the particular entries he is talking about. Mr. Schmitt likely is unaware that the Rule 26(f) process was prolonged by the need to establish coordinated discovery between these two cases. Mr. Schmitt also must not know that the parties submitted memoranda and had several conferences with Magistrate Rau during the Rule 26(f) process to address these and other disputed issues, before the first scheduling order in the litigation was issued on March 10, 2015, nearly two years after the litigation commenced.  (Dkt. 146.)

31.     Mr. Schmitt also faults counsel for the time spent on the initial disclosures in these cases.  Again, Mr. Schmitt does not identify the specific entries, but he greatly overstates the amount of attorney time spent on the Harris disclosures, the bulk of which was about 15 hours.  See Williams Decl. Ex. H at

35 (9/19/14, 9/22/14, and 9/25/14 entries). A few other entries mention initial disclosures, but as Mr. Schmitt concedes, they also include other significant tasks (e.g. working on notice issues). See id. (9/18/14, 9/23/14, 9/26/14 entries).

32.     Mr. Schmitt does not state what a "reasonable" amount of time would have been, but as explained above, the disclosures were prepared without any discovery from Chipotle. See supra ¶ 18. Thus, it took considerable time for me to obtain this information from the named plaintiffs and prepare a reasonably detailed estimate of damages. With my assistance, the named plaintiffs did their best to reconstruct (from memory) the time periods during which they had different positions, received different wage rates, and worked different shifts; their wages during each time period; and the amount of time they worked off the clock during each time period. As the named plaintiffs' contact and only counsel who had met with each of the named plaintiffs numerous times regarding their claims, I was the logical person to do the disclosures.

33.     Mr. Schmitt also challenges the time spent responding to the motion to decertify in Harris.  Schmitt Aff. ¶ 33. As the Court may recall, Chipotle's motion included a total of 76 pages of briefing, four declarations, and dozens of exhibits (Dkt. 246, 247, 396, 397, 398), to which we responded with a 58-page brief and a declaration with 58 exhibits. (Dkt. 393, 394.)  Plaintiffs' counsel had to comb through deposition transcripts and other documents to find evidence disproving Chipotle's factual assertions, as well to provide a complete factual record for the Court to rely upon. (Dkt. 423 at 4-14.) We also spent significant

time reading and distinguishing Chipotle's cited authority, which the Court also relied upon and agreed was inapposite. (Dkt. 423 at 21 n.7,  25-28, 30-33). And, a substantial number of hours went into preparing a bifurcated trial plan as part of our response.  (Dkt. 393 at 45-50). All of this work not only defeated Chipotle's decertification motion, but later proved invaluable as we prepared direct examinations, exhibit lists, and other materials for trial.

33.     Mr. Schmitt challenges the amount of time spent successfully opposing a "motion to dismiss."  Schmitt Aff. ¶ 32.  Again, Mr. Schmitt refers to "61 entries," but he does not identify them. Id. Assuming he is referring to Woodards (since no motion to dismiss was filed in Harris), Chipotle's motion (framed in the alternative as a motion for summary judgment) was supported by 40 total pages of briefing and several exhibits. (Woodards Dkt. 14, 15, 28, 29). We responded with a 27-page brief and our own set of exhibits.  (Woodards Dkt. 25, 26, 26-1 through 26-8). To fully respond, counsel had to devote considerable time to researching and distinguishing Chipotle's inapposite and mis-cited cases.  (See, e.g., Dkt. 25 at 11-13, 14 n.7, 16 n.8, 24.)  It also required us to research relatively obscure issues such as whether (and if so, when) an opt-in plaintiff is considered a "party" to FLSA litigation for collateral estoppel purposes. (See id. at 11-13.)

34.     Mr. Schmitt says we billed an "extraordinary amount for issues related to the Protective Order in this matter." Schmitt Aff. ¶ 33. I agree, and it was Chipotle's fault.  See supra ¶  14.

35.     Mr. Schmitt claims 14 entries that refer to <u>Turner</u> or other FLSA litigation against Chipotle demonstrate that "Plaintiffs' counsel are trying to recover for time spent on litigation other than this case." Schmitt Aff. ¶¶ 35-36. This is false. Neither I nor any of the other plaintiff attorneys billed time from another case to this one. Moreover, none of us represent collective or individual FLSA plaintiffs in any other case, except for <u>Turner</u> and an individual objector to a settlement in a California state class action (which is currently on appeal). Any mention of related cases against Chipotle reflects monitoring, consulting, and other activities, which were prudent given the obvious similarity among all of these cases and Chipotle's penchant for playing one case off another, to its advantage. <u>See, e.g.</u> Chipotle's March 22, 2017 Motion for a Second Continuance of Trial (Dkt. 413 at ¶ 5) (citing <u>Strout v. Chipotle</u> as an excuse for a third continuance of the <u>Harris</u> trial).

36.     Chipotle asserts that I spent 110 hours on "non-compensable, administrative work," see Opp. at 27, and Schmitt criticizes me for not appointing somebody with a lower billing rate to secure office space and furniture for trial. Schmitt ¶ 38.  Chipotle does not identify the entries or even the work it claims was "non-compensable," so I am unable to provide a response other than to note that as lead counsel in this case, a significant part of my role was assigning work, coordinating efforts, and other managerial duties. With respect to office space (24 hours), my office is in Long Lake, about an hour's drive west of St. Paul. No other plaintiffs' counsel have space available in St. Paul, or even in Minneapolis. I

deemed it prudent to find appropriate space in close proximity to the courthouse where the trial would be held. I have no employees, and nobody else available to undertake the project. Even if there was somebody available, I still had to determine the appropriate amount and configuration of space, view the available options, negotiate the lease, obtain furniture, etc. Nevertheless, I agree that $600 an hour is too steep for this sort of work. A 50% reduction of this time is appropriate.

37.     Mr. Schmitt claims any entries that mention Colleen Calandra (a Bachus & Schanker attorney who left soon after this litigation began) should not be counted, because Plaintiffs did not submit any time for Ms. Calandra in this case.    Schmitt Aff. ¶ 40.   My understanding is that no time is sought for Ms. Calandra only because Bachus & Schanker has no time records for Ms. Calandra for her work on this litigation. This, however, should not render any of my time uncompensable. Also, the implication that I spent "52 hours" on Ms. Calandra's pro hac vice application is false.  See Opp. at 24. Only two of my billing entries even mention a pro hac vice application for Calandra, and they include other work as well. See Williams Decl. Ex. H at 4 (7/23/13 and 7/24/13 entries, totaling 2.2 hours).

38.     Mr. Schmitt claims that 14 (unidentified) entries of mine should be reduced because they were for "document review," which he contends was below my pay grade. Schmitt Aff. ¶ 42. It was necessary to assign document review work to all of plaintiffs' counsel (including me) because Chipotle's last significant

20

document production was not until February 29, 2016, and we needed to finish the review as quickly as possible so we could take depositions and do follow-up discovery before the then-discovery deadline of June 29, 2016. (Dkt. 173.) Moreover, as the attorney principally responsible for litigating this matter, I needed a good understanding of the emails, labor reports, and other information exchanged among Chipotle managers on a near-daily basis. My notes regarding these and other documents helped me prepare for depositions, promulgate supplemental discovery requests, respond to Chipotle's decertification motion, and prepare for trial.

39.     Mr. Schmitt claims our records show 183 hours of work on the fee petition, going as far back as January 24, 2017. Schmitt Aff. ¶ 46.  Because Mr. Schmitt does not identify the entries, it is impossible to know whether his count of hours is accurate. I can say with reasonable certainty, however, that no work on the fee petition was commenced before July of 2017, when a settlement in principle was reached.

40.     Chipotle and Mr. Schmitt criticize me for "block-billing," but do not identify any particular entries. Chipotle does, however, describe instances in which I billed more than 10 hours in a single entry.  Opp at 34.  Most of these entries involved different aspects of the same general task or project: a) 12/9/13 (11.5 hours), 12/10/13 (10.5 hours), 12/23/13 (11.3 hours), 12/27/13 (13.8 hours), 12/28/13 (10.3 hours), 12/29/13 (10.9 hours), and 12/30/13 (12.5 hours) – multiple tasks relating to our reply on our motion for conditional certification of a

collective; b) 6/8/16 (10.8 hours) – the deposition of Crystal store manager Jose Ramirez, and a file memo drafted later that evening, while my memory was still fresh; c) 1/2/17 (11.2 hours), 1/8/17 (12.7 hours), 1/9/17 (13.6 hours), and 1/10/17 (11.3 hours) – multiple tasks related to our opposition to Chipotle's motion to decertify; and d) 7/1/17 (12.8 hours), 7/2/17 (14.7 hours), and 7/5/17 (15.4 hours) – multiple tasks to prepare for trial.

**Expenses**

41.    With my original Declaration submitted in support of Plaintiffs' motion for an award of fees, expenses, and service awards, I attached a verified expense report detailing with specificity the out-of-pocket costs and expenses (totaling $33,549.55) that my firm reasonably incurred in _Harris_ for which my firm seeks reimbursement. (_See_ _Harris_ Dkt. 450-9 [Williams Decl., Ex. I])  In preparing this Supplemental Declaration, however, I discovered that several entries in my original itemization reflected miles, instead of mileage (which I charge at the IRS Standard Mileage Rate for each year in which the mileage was incurred).  I also discovered that the August 15, 2017 Applecon balance included finance charges, which I have removed, leaving $3,867.01 as the correct amount to be reimbursed for Applecon's services. Other minor corrections have also been made.  A revised itemization totaling $33,604.16 is attached hereto as Exhibit E.

42.    Also attached as part of Exhibit E are true and correct copies of receipts, invoices, statements, and other back-up documentation to support my firm's revised _Harris_ expense report. Each item of cost and expense described in

and comprising my firm's <u>Harris</u> expense report, supported by the back-up documentation, was reasonably-incurred in the <u>Harris</u> litigation. The order of presentation of this back-up documentation follows the same order of presentation of the detailed entries in my firm's itemization of expenses, to the extent such documentation is applicable and/or available.

43.     Expenses for the <u>Woodards</u> action are documented in the same manner.   My revised, documented itemization totals $1,050.10.   <u>See</u> Ex. F attached hereto.

44.     The amounts for which my firm seeks reimbursement for each of these reasonably-incurred out-of-pocket costs and expenses are based on actual amounts incurred (including reasonable gratuities paid in connection with restaurant meal service and taxi service), without the addition of any percentage for administrative overhead or any late fees or charges.

I declare, certify, verify, and state under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on October 27, 2017


 s/Kent M. Williams
Kent M. Williams